IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IRIS BISHOP, Administratrix of the Estate of MICHAEL ANTHONY BISHOP, Plaintiff, <br><br> v. <br><br> WEXFORD HEALTH SOURCES, INC., CORRECT CARE SOLUTIONS, LLC, and UPMC HAMOT. <br> Defendants. | NO. 1:17-cv-60 |

## **MEMORANDUM OPINION**

I.    INTRODUCTION

Plaintiff, Iris Bishop, as Administratrix of the Estate of her brother, Michael Anthony Bishop, commenced this action against defendants Wexford Health Sources, Inc. ("Wexford") and Correct Care Solutions, LLC ("Correct Care"), alleging federal constitutional claims based upon deliberate indifference to Mr. Bishop's serious medical needs while he was incarcerated at the State Correctional Institution at Albion, Pennsylvania ("SCI-Albion"), and against defendant UPMC-Hamot, alleging a medical negligence claim under state law. Wexford has moved for summary judgment on Plaintiff's Eighth Amendment claim under 42 U.S.C. § 1983, which is Plaintiff's sole claim against it. For the reasons set forth below, the court will grant Wexford's motion.

II.    PROCEDURAL HISTORY

On January 6, 2017, Plaintiff filed a Complaint alleging wrongful death and survival claims against Wexford, Correct Care and UPMC-Hamot in the Court of Common Pleas of Erie County, Pennsylvania. (ECF No. 22-1). On March 1, 2017, following reinstatement of the Complaint in the state court, ECF No. 1-2, p. 1, and service upon Wexford, Wexford removed the action to this Court pursuant to 28 U.S.C. §§ 1441 and 1443. (ECF No. 1). This court has subject jurisdiction of the action under 28 U.S.C. § 1331 as Plaintiff's complaint asserts federal constitutional claims pursuant to 42 U.S.C. § 1983 against Wexford and Comfort Care. The court has supplemental jurisdiction over Plaintiff's state law

1

claim against UPMC-Hamot pursuant to 28 U.S.C. § 367(a). In accordance with 28 U.S.C. § 636(c)(1), all parties have consented to the jurisdiction of a United States Magistrate Judge to conduct proceedings in this case, including entry of final judgment. (ECF No. 51).

Wexford moved to dismiss Plaintiff's Complaint arguing that Plaintiff's claim against Wexford is barred by the statute of limitations. (ECF Nos. 4, 5). Plaintiff filed a First Amended Complaint on March 20, 2017, and a Second Amended Complaint on March 31, 2017. (ECF Nos. 10, 19, 20). Thereafter, Wexford renewed its motion to dismiss, which the court, Rothstein J., denied on November 13, 2017. (ECF No. 32). Judge Rothstein determined that factual issues as to the timing of any grievances submitted by Mr. Bishop and any potential tolling of the statute of limitations precluded judgment in favor of Wexford and ordered the case to proceed to discovery. (ECF No. 32). Fact discovery closed on October 19, 2018.

Wexford filed its motion for summary judgment, concise statement of material facts, appendix and brief on November 8, 2018. (ECF Nos. 69, 70, 71, 72). Plaintiff filed her brief and concise statement of material facts in opposition to Wexford's motion and an appendix of exhibits on December 3, 2018. (ECF Nos. 79, 80, 81). Wexford filed a reply to Plaintiff's opposition papers on December 14, 2018. (ECF No. 84). Wexford's motion is ripe for decision.

III.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the initial burden of identifying evidence, or the lack thereof, which demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986); *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir.2007); *UPMC Health System v. Metropolitan Live Ins. Co.*, 391 F.3d 497, 502 (3d Cir.2004). The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial. Fed.R.Civ.P. 56(e); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460–61 (3d Cir.1989) (the non-movant must present

2

affirmative evidence—more than a scintilla but less than a preponderance—which supports each element of his claim to defeat a properly presented motion for summary judgment). The non-moving party must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e. depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim. *Celotex*, 477 U.S. at 322. See also *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir.2001).

When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Pearson v. Prison Health Service*, 850 F.3d 526, 533-34 (3d Cir. 2017) (quoting *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011)). In assessing the motion, the court views the facts and draws all reasonable inferences in the light most favorable to the non-movant, here Plaintiff Iris Bishop. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

IV.  MATERIAL FACTS[1]

Mr. Bishop was incarcerated at SCI-Albion at all times relevant to this action until his death on May 8, 2015. Wexford provided medical services to Mr. Bishop and the other inmates at SCI-Albion

---

[1] The facts material to Wexford's motion are largely undisputed and derived from Wexford's Concise Statement of Material Facts, Plaintiff's Response to Wexford's Concise Statement, and the exhibits appended to each. In reviewing the medical records appended to the parties' submissions, the court has taken judicial notice of the meaning of certain medical terms, abbreviations and acronyms which are readily verifiable on online dictionaries (e.g., medilexicon.com). See *Gonzalez v. Guzman*, No. 17-CV-241-GPC-BGS, 2017 WL 5446087, at *3 (S.D. Cal. Nov. 14, 2017). Dictionary definitions are a proper subject for judicial notice. See *Wayne v. Leal*, 2009 WL 2406299, at *4 (S.D. Cal. Aug. 4, 2000) (noting that a court may take judicial notice of facts "that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned, such as an almanac, dictionary, calendar, or other similar source"); FED. R. EVID. 201(b)-c(1) (noting that the court "may take judicial notice on its own.")

under a contract with the Pennsylvania Department of Corrections ("DOC") until August 31, 2014.[2]

Mr. Bishop first reported to the prison's medical department with a complaint of abdominal issues on April 9, 2013. (ECF No. 82-1, p. 1). Progress notes for this "sick call" state that Mr. Bishop's medical history included a prior umbilical hernia repair and current complaints of pain in the area of the repair commencing on April 4, 2019. Physician's Assistant Daniel Shoup assessed Mr. Bishop's condition as a "ventral hernia," noting "soft mobile abdominal contents protruding through ventral superumbilical hernia," which was "partially reduceable." Shoup did not recommend any medication at the time. However, he did recommend that Mr. Bishop reduce his weight, increase his fluids, and follow-up as needed for "increase in size, pain or if non-reducable (sic)." (Id.)

Mr. Bishop returned to the medical department on June 18, 2013 with complaints of "umbilical pain, stomach wrenching, referred pain to testicles and ... radicular pain in his perineum—'lighten bolt.'" PA Joseph Talarico noted "exam unremarkable," and advised Mr. Bishop to purchase Motrin at the commissary. (ECF No. 82-1, p. 2). Mr. Bishop was seen again on July 11, 2013, at which time he was noted to have "BHP," an abbreviation for benign prostatic hyperplasia, or an enlarged prostate. (Id.) Mr. Bishop underwent a physical examination on August 15, 2013, the results of which included notations of an abnormal prostate, weight of 280 lbs., and a height of 69 inches.[3] (ECF No. 82-1, pp. 3-4).

Mr. Bishop again received medical attention for conditions associated with his hernia and abdomen on January 14, 2014. Notes of this encounter indicate that Mr. Bishop was in the prison's "restricted housing unit" at the time and was examined by Chris Collins, CRNP, through the cell bars. Collins reported that Mr. Bishop's hernia was causing "great pain." Collins' note indicates that some action would be taken "to evaluate need for a hernia belt" for Mr. Bishop. (ECF No. 82-1, p. 6).

---

[2] Wexford's contract terminated on August 31, 2014. Thereafter, defendant Correct Care provided medical services at SCI-Albion.

[3] The signature of the individual who performed the examination is illegible, and the parties have not identified the examiner in their submissions. (ECF No. 82-1, p. 4).

4

Mr. Bishop was again seen for hernia-related discomfort on April 4, 2014 and April 10, 2014. During the April 10 encounter, Mr. Bishop's weight was recorded as 208 lbs. (ECF No. 82-1, p. 7).

On April 29, 2014, PA Stroup submitted a request for a urology consult regarding Mr. Bishop. In a "Consultative Record," under the heading "History of Present Illness/Injury/Physical Findings," he recorded that Mr. Bishop presented to the medical department with complaints of "urinary frequency [,] hesitancy pain [with] urination." This notation is followed immediately by another, which reads: "UA (-) 4 29-14," which appears to reference a negative urinalysis test on April 29, 2014. The Consultative Record goes on to note that Mr. Bishop had "BPH before 2010." The Consultative Record states that PA Stroup's request for a urology consult was approved by Robert Maxa, DO, the "Site Medical Director" on May 13, 2014, but rejected on May 29, 2014 by Stephen Ritz, DO, the Medical Director of Wexford, in favor of an alternative treatment plan, or "ATP." Dr. Ritz's alternative treatment plan directed a "trial course of antibiotics for potential prostatitis[4] & check post void residual: re-present after completion of antibiotics as needed." (ECF No. 82-1, p. 8).

A "progress note" authored by PA Stoup dated May 27, 2014 states "F/U for urologic c/o [care of] ABX [antibiotics] and dental O ADL No Show ABX Rxed and sent to Pt." (ECF No. 82-1, p.9) Although a bit cryptic, this notation indicates that an antibiotic prescription was filled and sent to Mr. Bishop. This interpretation is supported by both the Plaintiff's and the Defendants' Concise Statement of Material Facts, each of which acknowledges that Mr. Bishop was prescribed antibiotics in response to his complaints of urinary conditions. (ECF No. 71, ¶¶ 27-29; ECF No. 80, ¶¶ 27-29).

In a subsequent progress note dated May 29, 2014, PA Stroup recorded that Mr. Bishop returned to the medical department with complaints of burning and other problems with urination. (ECF No. 82-1, p.9). Stroup further reported that Mr. Bishop complained that he was up 8-10 times per night to urinate

---

[4] "Prostatitis" refers to swelling or inflammation of the prostate gland. See https://medical-dictionary.thefreedictionary.com/prostatitis

with occasional "good nights" of 4-5 times per night, that his "main complaint is pain penis, bladder," and that "Bactrim not helping at all."[5] Finally, Stroup recorded that Mr. Bishop complained of weight loss, specifically, a decrease in weight from 231 lbs. [date illegible] to 193 lbs. on May 29, 2014. Stroup's progress note concluded with an assessment of "dysuria" and a plan to continue Mr. Bishop on his current prescription of antibiotics with follow-up as needed and the addition of Pyridium, which is the brand name for Phenazopyridine, an analgesic that can relieve symptoms caused by urinary tract infections and other urinary problems. (Id.)

Mr. Bishop was scheduled to return to the medical department for a follow-up sick call on June 10, 2014 regarding his weight loss and pelvic pain, but he was a "no show." (ECF No. 82-1, p.10). Mr. Bishop did return to the medical department for a sick call on June 12, 2014. The record notes that this visit was again for weight loss and pelvic pain with urination, that Mr. Bishop reported no improvement in symptoms, and that the plan was for a "urine dipstick urology consult." This entry also includes a reference to urine dipstick results positive for leukocytes and negative blood. The assessment portion of the note states: "*A. R/O Bladder CA vs. BPH refractory.*" (ECF No. 82-1, p. 10) (emphasis supplied). Construing the evidence in the light most favorable to Plaintiff, the court understands this reference to reflect Stroup's assessment that Bishop may have bladder cancer rather than resistant BPH and that it was medically necessary or advisable to rule out the former. The note also references an order for a urinalysis with culture and sensitivity test and "consult pending results." (Id.)

On July 3, 2014, Mr. Bishop returned to the medical department with complaints of renewed urinary burning and pelvic pain. The progress note for this visit states: "Pt states he 'still has a few of those antibiotic pills' from the last time." (ECF No. 82-1, p. 11). The note also includes a reference to the onset following "most recent cath. Also notes Zantac not controlling heartburn." Under assessment, PA Stroup specified "R/O [rule out] UTI [urinary tract infection]" and stated that Mr. Bishop was

---

[5] Bactrim is the brand name of the generic antibiotic sulfamethoxazole trimethoprim (sometimes called co-trimoxazole) and is used to treat bacterial infections, including urinary tract infections (UTIs). See https://www.rxlist.com/bactrim-side-effects-drug-center.htm

6

"advised must take Rx as ordered[.] Should not still have any." This note also referenced a urinalysis with culture and sensitivity and a change from "Zantac to Prilosec 20 mg." (Id.)

On July 8, 2014, Mr. Bishop appeared for a sick call with complaints of continued burning with urination. Stroup also recorded that Mr. Bishop's weight was now down to 180 lbs. He again recorded an assessment of "R/O UTI," and stated a plan to draw a urinalysis "today." Immediately following this notation, Stroup recorded "H. pylori serology."[6] Id. On July 16, 2014, Stroup recorded a follow-up visit by Mr. Bishop and a positive UTI and increased pain with urination. (ECF No. 82-1, p. 11).

On July 18, 2014, Mr. Bishop saw PA Deonna Wright for a follow-up visit regarding "abnormal labs. Request special diet." Her progress note also referenced positive H. pylori as an objective finding. As an assessment, Wright recorded "PUD."[7] Under plan she recorded "See Rx. Prilosec BID, Doxy BID, Flagyl BID. No red sauce, pepper, onion diet." (ECF No. 82-1, p. 12). On August 1, 2014, Wright saw Mr. Bishop for another sick call and recorded under subjective: "'UTI'. Has been on mult. courses ABX. Reports dysuria, testicular pain. Also c/o Abd burning [illegible] [no or negative] change after the H. Pyleri. Reports 2 incidence of vomiting up blood (unverified) as well as weight loss." As an objective finding, Wright recorded a positive bulge proximal xiphoid with "TTP"; positive "excessive belching- hyperactive BS x4." Under assessment, Wright recorded "H. pylori, r/o UTI." Although Wright's handwriting is difficult to decipher, her "plan" notations appear to include references to "testicular pain/groin rash," another urinalysis test, and possible urology and GI consults for "refractory" abdominal pain, hematemesis and weight loss. (Id.)

Following his July 18, 2014 visit, Mr. Bishop's condition apparently continued to deteriorate. PA Wright recorded his next visit to medical on August 5, 2014 as an "emergency," noting Mr. Bishop's

---

[6] Helicobacter pylori or "H. pylori" is a type of bacteria. See https://medical-dictionary.thefreedictionary.com/H.+pylori

[7] PUD is an abbreviation commonly used for peptic ulcer disease. See https://medical-dictionary.thefreedictionary.com/PUD

7

severe refractory mid-abdominal pain with "emesis, belching, dysuria." Wright also noted a recent diagnosis of H. pylori and the medications prescribed for this condition, as well as "E. coli treated with Bactrim." She also recorded Bishop's history of "severe weight loss" and noted that his weight had decreased from 216 lbs. in January 2014 to 170 lbs. Under objective findings, Wright recorded Mr. Bishop's vital signs, noted that he "looks ill," was diaphoretic, and had a "palpable mass proximal xiphoid." She further stated that "*UA [with] C+S as well as KUB never performed that were ordered.*"[8] (ECF No. 82-1, p. 13) (emphasis supplied). After discussing the case with Dr. Maxa, Wright sent Mr. Bishop by ambulance to UPMC-Hamot. (ECF No. 71, ¶ 44; ECF No. 80, ¶ 44). Records of UPMC Hamot reflect that Bishop was admitted to that hospital at 4:01 pm on August 5, 2014. (EFC No. 82-2, p. 1).

On August 6, 2014, Christine Zirkle, a Corrections Health Care Administrator ("CHCA") employed by the DOC, noted in the medical record that Mr. Bishop had an abdominal mass with bowel and ureter obstruction and was having surgery for mass removal and stent insertion. CHCA Zirkle noted that she had contacted next-of-kin, Iris Bishop. (ECF No. 71, ¶ 45; ECF No. 80, ¶ 45). While at UPMC-Hamot, Mr. Bishop was seen by urology and gastroenterology, among other specialties. (ECF No. 71, ¶ 46; ECF No. 80, ¶ 46). Mr. Bishop was discharged from UPMC-Hamot on August 11, 2014, and the discharge summary was sent to Dr. Maxa at SCI-Albion on August 14, 2014. (ECF No. 71, ¶ 47; ECF No. 80, ¶ 47). Per the discharge summary, Mr. Bishop underwent an exploratory laparotomy, loop ileostomy formation, retroperitoneal node biopsy and repair of umbilical hernia on August 6, 2014. (ECF No. 71, ¶ 48; ECF No. 80, ¶ 48). The discharge summary noted:

> Also towards [Mr. Bishop's] discharge time, the oncologist spoke directly with pathology due to awaiting the final pathology. Per their records, it does not appear to be a malignancy and instead of (sic) possible benign process (Castleman's) is included in the differential. He is to follow up with these results. He is stable for discharge back to the prison on August 11, 2014. He is due to follow up with the Regional

---

[8] "KUB" is an acronym commonly used to refer to kidneys, ureters, and bladder and sometimes to refer to a plain frontal supine radiograph of the abdomen. See https://www.medilexicon.com/dictionary/47349

Cancer Center for final pathology results as well as with the General
Surgery office for routine postop care.

(ECF No. 82-2, p.6).

Dr. Maxa admitted Mr. Bishop to the infirmary back at SCI-Albion on August 11, 2014, noting the treatment and history while at UPMC-Hamot, and ordered ileostomy teaching and incision care. (ECF No. 71, ¶ 51; ECF No. 80, ¶ 51). On August 13, 2014, Dr. Maza examined Mr. Bishop, noted the recent surgery and course, and ordered current therapy to be maintained. (ECF No. 71, ¶ 53; ECF No. 80, ¶ 53). On August 14, 2014, Dr. Maxa reviewed the pathology report concerning Mr. Bishop. It noted as a final diagnosis—lymph node with follicular hyperplasia and no evidence of malignancy. The case had received interdepartmental review and been discussed with Dr. Symes on August 8, 2014. (ECF No. 71, ¶ 54; ECF No. 80, ¶ 54). Dr. Maxa also ordered a consult with Dr. Malhotra, an oncologist, on August 14, 2014, and the appointment was scheduled for August 25, 2014. (ECF No. 71, ¶ 55; ECF No. 80, ¶ 55). In the consult, Dr. Maxa noted that Mr. Bishop had been sent to the hospital due to abdominal pain and found to have a mass in his cecum/small bowel, that a bowel resection with ileostomy was done, and that the pathology report indicated a benign process. (ECF No. 71, ¶ 56; ECF No. 80, ¶ 56).

Dr. Maxa saw Mr. Bishop again on August 15, 2014 to monitor Mr. Bishop post-surgically and ordered maintenance of current therapy with nutritional supplement. (ECF No. 71, ¶ 57; ECF No. 80, ¶ 57). Lab work was done on August 15, 2014 with results reported back to Dr. Maxa on August 18, 2014. The results were abnormal but in Dr. Maxa's judgment no follow-up was needed. (ECF No. 71, ¶ 58; ECF No. 80, ¶ 58). Dr. Hakala saw Mr. Bishop as part of the post-surgical monitoring on August 16, 2014 and ordered a continued plan of care. (ECF No. 71, ¶ 59; ECF No. 80, ¶ 59). PA Stroup saw Mr. Bishop on August 17, 2014, confirmed the colostomy bag was in place and ordered continuous monitoring. (ECF No. 71, ¶ 60; ECF No. 80, ¶ 60). Dr. Maxa examined Mr. Bishop on August 18, 2014 regarding his status post-surgery. He maintained Mr. Bishop's current treatment plan. (ECF No. 71, ¶ 61; ECF No. 80, ¶ 61). On August 19, 2014, Dr. Maxa saw Mr. Bishop in follow-up and ordered medication and maintenance of current treatment. (ECF No. 71, ¶ 62; ECF No. 80, ¶ 62).

On August 20, 2014, Mr. Bishop was seen for his general surgery follow-up at UPMC-Hamot, which recommended further follow-up with general surgery in one month, and again in four months, as well as to follow-up with urology. (ECF No. 71, ¶ 64; ECF No. 80, ¶ 64). That same day, Dr. Maxa requested a urology consult for Mr. Bishop as follow-up from the August procedures. The appointment took place on October 2, 2014, and the urologist ordered continuation of medications, including Bactrim. (ECF No. 71, ¶ 65; ECF No. 80, ¶ 65).

On August 26, 2014, Mr. Bishop was seen by the oncologist via telemedicine, and the next day Dr. Maxa noted the urology follow-up was pending. Dr. Maxa saw Mr. Bishop twice on August 26, first in the morning in follow-up and to encourage ambulation and intake and, second, at the request of nursing because Mr. Bishop had fallen. Dr. Maxa assessed general weakness and increased caloric intake through prescriptions. The urology follow-up described above was approved on August 27, 2014. (ECF No. 71, ¶¶ 65-70; ECF No. 80, ¶¶ 65-70).

On August 27, 2014, Mr. Bishop was sent to UPMC-Hamot via ambulance after Dr. Maxa's assessment of acute renal failure. Mr. Bishop was discharged from UPMC-Hamot back to SCI-Albion on August 31, 2014. On October 2, 2014, the urologist, Dr. Dulabon at UPMC-Hamot, examined Mr. Bishop in follow-up to the cystoscopy and preoperative ureteral stent insertion on August 6, 2014. Dr. Dulabon noted that after the August 6, 2014 procedure, a repeat CT scan on August 27, 2014 had revealed normal kidneys and no evidence of air within the bladder. Dr. Dulabon also noted the absence of pathology results for Mr. Bishop's mass and that Mr. Bishop was unaware whether any further work-up was needed. Dr. Dulabon further observed that at the time of the cystoscopy on August 6 no overt bladder tumors were present. Dr. Dulabon referred Mr. Bishop for further lab work and ordered continued Bactrim for his recurrent urinary tract infections. (ECF No. 71, ¶¶ 73-76; ECF No. 80, ¶¶ 73-76).

A CT scan of Mr. Bishop's abdomen and pelvis was performed on October 28, 2014. The scan results showed a large right pelvic mass and also persistent 1 cm nodule in the right lung base. On

October 31, 2014, Dr. Dulabon performed a cystoscopy, which revealed a large pelvic mass measuring approximately 10 cm. On November 4, 2014, Mr. Bishop underwent a definitive biopsy of the bladder. This showed the mass to be a well-differentiated adenocarcinoma, which was presumed to have originated in Mr. Bishop's colon and to have invaded his bladder. (ECF No. 72-14, pp. 2-3). Subsequent radiation therapy at the Regional Cancer Center was unsuccessful in combatting Mr. Bishop's cancer. He succumbed to the disease on May 8, 2015.

V. DISCUSSION

A. Grounds for Summary Judgment

Wexford's motion advances three grounds in support of its request for summary judgment: (1) Plaintiff's Eighth Amendment claim fails because the record is insufficient to sustain a finding that Wexford was deliberately indifferent to Mr. Bishop's serious medical needs; (2) Plaintiff's § 1983 claim fails because Plaintiff has not produced evidence that Mr. Bishop received deficient care pursuant to a policy or custom of Wexford; and (3) Plaintiff's claim is barred by the statute of limitations.[9] The first two issues are related and the court will analyze them together. Because the court finds that Wexford is entitled to judgment as a matter of law based upon insufficiency of proof regarding the "policy or custom" element of Plaintiff's § 1983 claim, the court will not reach Wexford's statute of limitations defense.

B. Section 1983 and Eighth Amendment Liability

i. Deliberate Indifference to Serious Medical Need

Plaintiff prosecutes her Eighth Amendment claim against Wexford pursuant to 42 U.S.C. § 1983. Rather than conferring any substantive rights, § 1983 "provides a method for vindicating federal rights

---

[9] Wexford's papers discuss issues of administrative exhaustion, but only as they relate to possible tolling of the statute of limitations. Wexford acknowledges that the exhaustion requirements of the Prison Litigation Reform Act, 42 U.S.C. § 1997e, do not apply because Mr. Bishop was not confined to any correctional facility when Plaintiff filed suit. (ECF No. 86, p. 2). Section 1997e(a) states: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, *by a prisoner confined* in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." (emphasis supplied).

elsewhere conferred." *Hildebrand v. Allegheny Cnty.*, 757 F.3d 99, 104 (3d Cir. 2014) (citing *Albright v. Oliver*, 510 U.S. 266, 271 (1994)) (internal quotation marks and citations omitted). A plaintiff may prevail on a claim for relief under § 1983 by showing that he or she was (1) deprived of a federal right (2) by a person acting under color of state law. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980).[10] There is no dispute that Wexford is "a person acting under color of state law." *See Johnson v. Stempler*, 373 Fed. Appx. 151, 153-54 (3d Cir. 2010) (private prison doctors working under contract with the government act 'under color of state law' for purposes of § 1983 and may be sued under that statute) (quoting *West v. Atkins*, 487 U.S. 42, 54-57 (1988)). The question is, therefore, whether a reasonable jury could conclude that record evidence supports Plaintiff's claim that Wexford deprived Mr. Bishop of his rights under the Eighth Amendment. *See, e.g., Baskerville v. Young*, 2018 WL 3343235, at *2 (3d Cir. 2018) (citing *Helling v. McKinney*, 509 U.S. 25, 32 (1993)).

"The Eighth Amendment, through its prohibition on cruel and unusual punishment, prohibits the imposition of 'unnecessary and wanton infliction of pain contrary to contemporary standards of decency.'" *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017)(quoting *Helling v. McKinney*, 509 U.S. 25, 32, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)). In the context of an adequacy of care claim under the Eighth Amendment, an inmate must produce evidence that a defendant was "deliberately indifferent" to the inmate's serious medical needs in order to survive a motion for summary judgment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "[A] medical need is 'serious' for the purposes of a denial of medical care claim if it is either 'one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention.'" *Mattern v. City of Sea Isle*, 657 Fed. Appx 134, 139 (3d Cir. 2016) (quoting *Monmouth Cty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987)). Here, the record

---

[10] 42 U.S.C. § 1983 provides, in pertinent part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .".

evidence is easily sufficient to support a finding that Mr. Bishop had serious medical needs related to his chronic abdominal, urologic and other conditions, which were ultimately determined to include adenocarcinoma that likely originated in his colon and spread to his bladder. *See* ECF No. 77-2, at 7-9, 11, 13-16.

Next, the record must contain evidence to permit a reasonable jury to determine that Wexford acted with deliberate indifference to Mr. Bishop's serious medical need. Importantly, when it comes to claims of deliberate indifference, there is a "critical distinction" between allegations of a delay or denial of a recognized need for medical care and allegations of inadequate medical treatment. *Pearson.*, 850 F.3d at 535 (quoting *United States ex rel. Walker v. Fayette Cty.*, 599 F.2d 573, 575 n.2 (3d Cir. 1979)). A claim alleging the delay or denial of medical treatment requires inquiry into the subjective state of mind of the defendant and the reasons for the delay, which like other forms of scienter can be proven through circumstantial evidence and witness testimony. *Id.* But "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.* (citing *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976)). Furthermore, courts "disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment ... [which] remains a question of sound professional judgment." *Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (quoting *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)) (alterations in original).

Nonetheless, as the Court of Appeals has made clear, the fact that prison medical personnel have provided some medical care to an inmate does not preclude a finding of deliberate indifference:

> [T]here are circumstances in which some care is provided yet it is insufficient to satisfy constitutional requirements. For instance, prison officials may not, with deliberate indifference to the serious medical needs of the inmate, opt for "an easier and less efficacious treatment" of the inmate's condition. *West v. Keve*, 571 F.2d 158, 162 (3d Cir. 1978) (quoting *Williams v. Vincent*, 508 F.2d 541, 544 (2d Cir. 1974)). Nor may "prison authorities deny reasonable requests for medical treatment ... [when] such denial exposes the inmate 'to undue suffering or the threat of tangible residual injury.'" *Monmouth County Corr. Inst. Inmates*, 834 F.2d at 346 (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976)). And, "knowledge of the need for medical care [may not

13

> be accompanied by the] ... intentional refusal to provide that care." *Id.* (alterations in original) (quoting *Ancata v. Prison Health Servs.*, 769 F.2d 700, 704 (11th Cir. 1985)).

*Palakovic v. Wetzel*, 854 F.3d 209, 228 (3d Cir. 2017).

Although the record in this case presents a close question, it does include instances upon which a reasonable jury could find that Wexford personnel provided Mr. Bishop with medical care reflective of deliberate indifference prior to his "emergency" admission to UPMC-Hamot on August 5, 2014. These include the notations recording the protracted nature and severity of Mr. Bishop's symptoms after implementation of Dr. Reitz's ATP, without Wexford following-through with PA Stroup's recommendation for a urology consult, Wexford personnel's apparent lack of action following PA Stroup's recognition of the need to rule out bladder cancer as an alternative explanation for Mr. Bishop's symptoms, the apparent failure to perform a further urinalysis and culture and sensitivity test, and Mr. Bishop's dramatic weight loss while under Wexford's care. Nevertheless, these discrete deficiencies in the care provided to Mr. Bishop alone are not sufficient to sustain the viability of Plaintiff's § 1983 claim against Wexford.

      ii.      Corporate Liability—Policy or Custom

Wexford is a private, for-profit corporation that entered into a contract with the Pennsylvania DOC to provide medical services to inmates at SCI-Albion and other state correctional institutions. "To state a claim against a private corporation providing medical services under contract with a state prison system, a plaintiff must allege *a policy or custom* that resulted in the alleged constitutional violations at issue." *Palakovic v. Wetzel*, 854 F.3d 209, 232 (3d Cir. 2017) (emphasis supplied) (citing *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 583–84 (3d Cir. 2003)). Thus, "[w]hile a private corporation cannot be held vicariously liable for the actions of its staff, it may be held liable if 'it knew of and acquiesced in the deprivation of the plaintiff's rights.'" *Roach v. SCI Graterford Med. Dep't*, 398 F. Supp. 2d 379, 388 (E.D. Pa. 2005) (quoting *Miller v. City of Philadelphia*, No. CIV.A.96–3578, 1996 WL 683827, at *3–4 (E.D.Pa. Nov.26, 1996)). To meet this burden, the plaintiff must show that the

corporation, "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [plaintiff's] constitutional harm." *Id.* (quoting *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir.1989)). In this respect, a private corporation performing the functions of a state government is treated as the state and, like the state, it may be liable under § 1983 only if its subordinates acted pursuant to its policies, customs or practices and resulted in the plaintiff's constitutional injury.

The Court of Appeals has identified three situations where acts of a government employee may be deemed to be the result of a policy or custom of the governmental entity for whom the employee works, thereby rendering the entity liable under § 1983: (1) "where the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy," (2) "where no rule has been announced as policy but federal law has been violated by an act of the policymaker itself," or (3) "where the policymaker has failed to act affirmatively at all, though the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need." *Natale*, 318 F.3d at 584 (internal quotation marks and citations omitted). The Plaintiff bears the burden of proving that a "policymaker" is responsible for either the policy or the custom that caused the alleged constitutional violation. *Wareham v. Pennsylvania Dep't of Corr.*, 2014 WL 3453711, at *5–6 (W.D. Pa. July 15, 2014).

Plaintiff's Second Amended Complaint alleged generally that Wexford maintained policies and practices that elevated cost containment over proper medical care of inmates and plausibly inferred that Wexford personnel deferred or denied to Mr. Bishop necessary diagnostic tests, consults and referrals pursuant to that policy. Courts have found plausible claims of medical indifference where prison physicians refuse to provide adequate care for non-medical reasons, such as cost containment. In *Shultz v. Allegheny County*, 835 F. Supp. 2d 14 (W.D. Pa. 2011), for example, the court addressed the question

15

of whether the prison medical defendants' failure to provide appropriate treatment of the plaintiff's pneumonia symptoms, ultimately leading to her death, constituted deliberate indifference. *Id.* at 17. The plaintiff's representative alleged that despite the plaintiff's various symptoms, the prison medical staff, in an effort to control and contain costs, delayed performing diagnostic tests and transferring the plaintiff to an outside hospital. *Id.* The defendants contended that merely pointing to a policy of implementing cost savings fails to satisfy the threshold needed to plead an adequate deliberate indifference claim. *Id.* at 22. The court, however, found "the facts alleged and the reasonable inferences drawn therefrom are enough to nudge the Eighth Amendment claim across the line between a possible and plausible claim for relief" and create a "reasonably founded hope that the [discovery] process will reveal relevant evidence to support the claim." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 n.8 (2007). See also, *Robinson v. Corizon Health, Inc.*, 2016 WL 7235314, at *7 (E.D. Pa. Dec. 13, 2016) (inmate's complaint stated plausible claim of deliberate indifference where it alleged the medical defendants discovered plaintiff had kidney cancer but knowingly and willfully refused to use preventative medicine or send plaintiff to out-of-prison medical centers and doctors for prompt and adequate testing because they receive financial bonuses for avoiding use of such measures).

The complaints at issue in *Schultz* and *Robinson* survived dismissal on motions pursuant to Rule 12(b)(6). In contrast, the present case is before the court on Wexford's motion for summary judgment. In this posture, the Plaintiff cannot rest on the allegations of her Second Amended Complaint to defeat Wexford's motion. Because the existence of a policy or custom is a necessary element of Plaintiff's Eighth Amendment claim against Wexford, and Wexford has properly challenged this element in its motion, it was incumbent upon Plaintiff to identify evidence in the record sufficient to support its existence. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). Here, Plaintiff has failed to identify any evidence to demonstrate that Mr. Bishop's constitutional injury was the result of a

16

policy or custom fairly attributable to Wexford. As noted, the record includes actions and failures to act by Wexford personnel that a reasonable jury could consider to have been deliberately indifferent to Mr. Bishop's serious medical needs. Plaintiff has not, however, linked any of these discrete deficiencies to any actual policy or custom of Wexford or even identified a Wexford "policymaker."

"In order to ascertain who is a policymaker, 'a court must determine which official has final, unreviewable discretion to make a decision or take action.'" *Kneipp v. Tedder*, 95 F.3d 1199, 1212 (3d Cir.1996) (citing *Andrews v. City of Phila.*, 895 F.2d 1469, 1480 (3d Cir.1990)). According to the Supreme Court, "'whether a particular official has final policymaking authority is a question of state law.'" *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (quoting *St. Louis v. Praprotnik*, 485 U.S. 112 (1988) (plurality opinion)). Thus, to ascertain if an official has "final policymaking" authority, the court must determine "(1) whether as a matter of state law, the official is responsible for making policy in the particular area of ... business in question, and (2) whether the official's authority to make policy in that area is final and unreviewable." *Hill v. Borough of Kutztown*, 455 F.3d 225, 245 (3d Cir.2006) (internal citations omitted).

In the private employer context, "the relevant 'policymaker' inquiry is whether [the employee], as a matter of state and local positive law, or custom or usage having the force of law, exercised final policymaking authority." *Wallace v. Powell*, 2012 WL 2590150, at *14 (M.D. Pa. July 3, 2012) (quoting *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 729 (4th Cir.1999)). And, the Third Circuit has indicated that an individual, even without final policymaking authority, can bind his or her employer when the entity delegates authority or acquiesces in the individual's conduct. See *Laverdure v. Cnty. of Montgomery*, 324 F.3d 123, 125 (3d Cir.2003).

The closest Plaintiff comes to identifying a policymaker is Dr. Ritz, the Medical Director of Wexford, who rejected the request for a urology consult that had been advanced by PA Stroup and approved by Dr. Maxa, the Site Medical Director. While Dr. Ritz's title of "Medical Director" connotes a certain level of authority, this alone is insufficient to establish his status as a final "policymaker,"

17

particularly where Plaintiff has neither argued that Dr. Ritz was a final policymaker or identified other evidence to support such status.[11] See *Martin v. Sec'y of Corr.*, 2018 WL 2465180, at *3 (M.D. Pa. June 1, 2018) (complaint against private corporation providing medical services to inmates failed to state a § 1983 claim where it "failed to make reference to any final policymaker, by name, title or otherwise, that was aware of the alleged deliberate indifference to his medical needs and acquiesced to it").

Although Plaintiff's Second Amended Complaint alleged generally that Wexford had policies and practices that elevated cost containment over proper medical care of inmates, Plaintiff has not identified any evidence in the record to support a triable issue of fact regarding this allegation. As Wexford properly raised the sufficiency of the evidence regarding this necessary element of liability in its motion, and Plaintiff has failed to put forth evidence to support its existence, Rule 56(a) mandates the entry of summary judgment in favor of Wexford.[12]

---

[11] Even if the court were to assume that Dr. Ritz was a policymaker on behalf of Wexford, the record remains insufficient to support that he directed, approved of, or acquiesced in any *other* alleged deficiencies in Mr. Bishop's care, and, standing alone, Dr. Ritz's decision to reject Stroup's request for a urology consult cannot sustain a finding of deliberate indifference, particularly in light of the undisputed fact that Dr. Ritz proposed an alternative treatment plan that directed follow-up at the conclusion of a course of antibiotics. Mr. Bishop's ultimate demise from conditions that included bladder cancer plausibly supports the conclusion that Dr. Ritz's decision to deny the urology consult may have been incorrect or an error in judgment, but there is no evidence that his decision resulted from an improper motive or deliberate indifference to Mr. Bishop's medical needs. See *Tillery*, 2018 WL 3521212, at *5 (a disagreement "over alternate treatment plans" cannot sustain "a constitutional claim under § 1983").

[12] While it is unnecessary to reach the merits of Wexford's statute of limitations defense, the court notes that tolling principles such as the discovery rule may apply to ameliorate the effect of its strict application. See *Debiec v. Cabot Corp.*, 352 F.3d 117, 128–29 (3d Cir. 2003); *Mest v. Cabot Corp.*, 449 F.3d 502, 510–11 (3d Cir. 2006). Under the rule, even if a plaintiff suffers an injury, the statute of limitations does not begin to run until "the plaintiff knows, or reasonably should know, (1) that he has been injured, and (2) that his injury has been caused by another party's conduct." *Debiec*, 352 F.3d at 129 (internal quotation marks and citation omitted). In order to take advantage of the discovery rule, a plaintiff must have exercised "due diligence" in investigating his physical condition. *Bohus v. Beloff*, 950 F.2d 919, 924 (3d Cir. 1991). Unlike a person at liberty, during the months preceding his cancer diagnosis, Mr. Bishop's ability to investigate and ascertain a delay in diagnosis would have been extremely limited. As the Court of Appeals has noted, "[t]he question whether a plaintiff has exercised reasonable diligence is usually a jury question." *Id.* at 925.

VI.  CONCLUSION

Defendant Wexford's motion for summary judgment [ECF No. 69] is hereby GRANTED. A final judgment will be entered in favor of Defendant Wexford and against Plaintiff Iris Bishop, as Administratrix of the Estate of Michael Anthony Bishop, in a separate order in accordance with Fed. R. Civ. P. 58.

An order will follow.

Richard A. Lanzillo
United States Magistrate Judge

Dated this 8th day of February, 2019.