IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IRIS BISHOP, Administratrix of the Estate of )
MICHAEL ANTHONY BISHOP,                      )       NO. 1:17-cv-60
                    Plaintiff,               )
                                             )
         v.                                  )
                                             )       Richard A. Lanzillo
WEXFORD HEALTH SOURCES, INC.,                )       United States Magistrate Judge
CORRECT CARE SOLUTIONS, LLC, and             )
UPMC HAMOT.                                   )
                    Defendants.              )

## MEMORANDUM OPINION

### I.    INTRODUCTION

Plaintiff Iris Bishop, as Administratrix of the Estate of her brother, Michael Anthony

Bishop, commenced this action against defendants Wexford Health Sources, Inc. ("Wexford")

and Correct Care Solutions, LLC ("Correct Care"), alleging federal constitutional claims based

upon deliberate indifference to Mr. Bishop's serious medical needs while he was incarcerated at

the State Correctional Institution at Albion, Pennsylvania ("SCI-Albion"), and against defendant

UPMC-Hamot, alleging a medical negligence claim under state law.  Correct Care has moved for

summary judgment on Plaintiff's Eighth Amendment claim under 42 U.S.C. § 1983, which is

Plaintiff's sole claim against it.  For the reasons set forth below, the court will grant Correct

Care's motion.

### II.   PROCEDURAL HISTORY

On January 6, 2017, Plaintiff filed a Complaint alleging wrongful death and survival

claims against Wexford, Correct Care and UPMC-Hamot in the Court of Common Pleas of Erie

County, Pennsylvania.  (ECF No. 22-1).  On March 1, 2017, following reinstatement of the

Complaint in the state court, ECF No. 1-2, p. 1, Wexford removed the action to this Court

pursuant to 28 U.S.C. §§ 1441 and 1443. (ECF No. 1). This court has subject jurisdiction of the action under 28 U.S.C. § 1331 as Plaintiff's complaint asserts federal constitutional claims pursuant to 42 U.S.C. § 1983 against Wexford and Comfort Care. The court has supplemental jurisdiction over Plaintiff's state law claim against UPMC-Hamot pursuant to 28 U.S.C. § 367(a). In accordance with 28 U.S.C. § 636(c)(1), all parties have consented to the jurisdiction of a United States Magistrate Judge to conduct proceedings in this case, including entry of final judgment. (ECF No. 51).

Plaintiff filed a First Amended Complaint on March 20, 2017, and a Second Amended Complaint on March 31, 2017. (ECF Nos. 10, 19, 20). After initial motion practice, the case proceeded to fact discovery, which closed on October 19, 2018. Correct Care filed its motion for summary judgment, concise statement of material facts, appendix and brief on November 9, 2018. (ECF Nos. 74, 75, 76, 77). Plaintiff filed her brief and concise statement of material facts in opposition to Correct Care's motion and an appendix of exhibits on December 3, 2018. (ECF Nos. 82, 83). Correct Care filed a reply to Plaintiff's opposition papers on December 14, 2018. (ECF No. 87). Correct Care's motion is ripe for decision.

III.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the initial burden of identifying evidence, or the lack thereof, which demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986); *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007); *UPMC Health System v. Metropolitan Live Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004). The burden then shifts to the non-movant to come forward with specific facts showing a

2

genuine issue for trial. Fed. R. Civ. P. 56(e); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460–61 (3d Cir. 1989) (the non-movant must present affirmative evidence—more than a scintilla but less than a preponderance—which supports each element of his claim to defeat a properly presented motion for summary judgment). The non-moving party must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e. depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim. *Celotex*, 477 U.S. at 322. See also *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001).

When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Pearson v. Prison Health Service*, 850 F.3d 526, 533-34 (3d Cir. 2017) (quoting *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011)). In assessing the motion, the court views the facts and draws all reasonable inferences in the light most favorable to the non-movant, here Plaintiff Iris Bishop. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

IV. MATERIAL FACTS[1]

Mr. Bishop was incarcerated at SCI-Albion at all times relevant to this action until his death on May 8, 2015. Correct Care became the health care services contractor for the Pennsylvania Department of Corrections ("DOC") on September 1, 2014, and has provided medical services to inmates within the DOC, including inmates at SCI-Albion, since that date. (ECF No. 76, ¶¶ 1-2; ECF No. 83, ¶¶ 1-2). Prior to September 1, 2014, Wexford provided medical services to Mr. Bishop and the other inmates at SCI-Albion.[2]

A. Medical History Before September 1, 2014

When Correct Care took over medical services from Wexford, Mr. Bishop already had an extensive history of visits to SCI-Albion's medical department and infirmary. He had been seen and received medical services for conditions that included abdominal pain associated with a prior umbilical hernia repair, benign prostatic hyperplasia (enlarged prostate), dramatic weight loss (from 280 lbs. on June 18, 2013 to 170 lbs. on August 5, 2014),[3] and dysuria (pain on urination) and urinary frequency, which the medical department associated with recurrent urinary tract infections and found resistant to repeated rounds of antibiotics.

[1] The facts material to Correct Care's motion are largely undisputed and derived from Correct Care's Concise Statement of Material Facts, Plaintiff's Response to Correct Care's Concise Statement, and the exhibits appended to the parties' submissions. In reviewing the medical records appended to the parties' submissions, the court has taken judicial notice of the meaning of certain medical terms, abbreviations and acronyms which are readily verifiable on online dictionaries (e.g., medilexicon.com). See *Gonzalez v. Guzman*, No. 17-CV-241-GPC-BGS, 2017 WL 5446087, at *3 (S.D. Cal. Nov. 14, 2017). Dictionary definitions are a proper subject for judicial notice. See *Wayne v. Leal*, 2009 WL 2406299, at *4 (S.D. Cal. Aug. 4, 2000) (noting that a court may take judicial notice of facts "that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned, such as an almanac, dictionary, calendar, or other similar source"); FED. R. EVID. 201(b)-c(1) (noting that the court "may take judicial notice on its own.")

[2] The medical services contract between Wexford and the DOC terminated on August 31, 2014.

[3] Mr. Bishop's medical records include regular entries tracking his weight loss, including the following: 280 lbs. on June 18, 2013, 208 lbs. on April 10, 2014, 193 lbs. on May 29, 2014, 180 lbs. on July 8, 2014, and 170 lbs. on August 5, 2014.

Following a "sick call" visit to the medical department by Mr. Bishop on June 12, 2014, a physician assistant, Daniel Shoup, noted Mr. Bishop's significant weight loss and recurrent pelvic pain with urination and assessed the need to "R/O Bladder CA[4] [cancer] vs. BPH[5] [benign prostatic hyperplasia] refractory." (ECF No. 82-1, p. 10). Construing the evidence in the light most favorable to Plaintiff, the court understands this reference to reflect PA Stroup's assessment that Bishop may have bladder cancer rather than resistant benign prostatic hyperplasia and that it was medically necessary or advisable to rule out the former. The note also references an order for a urinalysis with culture and sensitivity test and "consult pending results." (Id.).

On July 18, 2014, Mr. Bishop saw another physician assistant, Deonna Wright, for a follow-up visit regarding "abnormal labs. Request special diet." (ECF No. 82-1, p. 12). Her progress note also referenced positive H. pylori as an objective finding.[6] (Id.). As an assessment, PA Wright recorded "PUD."[7] Under plan she recorded "See Rx. Prilosec BID, Doxy BID, Flagyl BID. No red sauce, pepper, onion diet." (Id.).

On August 1, 2014, PA Wright saw Mr. Bishop for another sick call and recorded that he had an apparent urinary tract infection and had been on multiple course of antibiotics. She noted that Mr. Bishop reported dysuria, testicular pain, abdominal burning, two incidents of vomiting-up blood, which PA Wright listed as "unverified," and weight loss. As an objective

---

[4] CA is an abbreviation frequently used for cancer. *See* https://www.medilexicon.com/abbreviations?search=CA&target=abbreviations

[5] BPH is an abbreviation commonly used for benign prostatic hyperplasia. *See* https://www.medilexicon.com/dictionary/42539.

[6] H. pylori or "helicobacter pylori" is "a bacterial species that produces urease and causes gastritis and nearly all peptic ulcer disease of the stomach and duodenum. Infection with this organism also plays an etiologic role (probably along with dietary cofactors) in dysplasia and metaplasia of gastric mucosa, distal gastric adenocarcinoma, and non-Hodgkin lymphoma of the stomach." *See* https://www.medilexicon.com/dictionary/39638

[7] PUD is an abbreviation commonly used for peptic ulcer disease. *See* https://medical-dictionary.thefreedictionary.com/PUD

5

finding, PA Wright recorded a "positive bulge proximal xiphoid." Under assessment, PA Wright recorded "H. pylori, r/o UTI." Although Wright's handwriting is difficult to decipher, her "plan" notations appear to include references to "testicular pain/groin rash," another urinalysis test, and possible urology and GI consults for "refractory" abdominal pain, hematemesis and weight loss. (Id.)

Following his July 18, 2014 visit, Mr. Bishop's condition continued to deteriorate. On August 5, 2014, his visit to the medical department was recorded as an "emergency," noting Mr. Bishop's severe refractory mid-abdominal pain with "emesis [vomiting], belching, [and] dysuria." A recent diagnosis of H. pylori and medications prescribed for this condition, as well as "E. coli treated with Bactrim" were also noted. PA Wright recorded Mr. Bishop's "severe weight loss," specifically noting that his weight had decreased from 216 lbs. in January 2014 to 170 lbs. Under objective findings, PA Wright recorded Mr. Bishop's vital signs, noted that he "looks ill," was diaphoretic, and had a "palpable mass proximal xiphoid." She further stated that "UA [with] C+S as well as KUB never performed that were ordered."[8] (ECF No. 82-1, p. 13) After discussing the case with Dr. Maxa, PA Wright sent Mr. Bishop by ambulance to UPMC-Hamot. (ECF No. 71, ¶ 44; ECF No. 80, ¶ 44). Records of UPMC-Hamot reflect that Bishop was admitted to that hospital at 4:01 pm on August 5, 2014. (ECF No. 76, ¶¶ 6-7; ECF No. 83, ¶¶ 6-7; ECF No. 82-2, p. 1; Exh. 1A, p. 342; Exh. 5, pp. 69-70).

Mr. Bishop remained at UPMC-Hamot from August 5 until his discharge on August 11, 2014. UPMC-Hamot records noted primary diagnoses of "small bowel obstruction likely lymphoma, acute kidney injury, and accelerated hypertension" and a secondary diagnosis of

---

[8] "KUB" is an abbreviation commonly used to refer to kidneys, ureters, and bladder, and sometimes to refer to a plain frontal supine radiograph of the abdomen. See https://www.medilexicon.com/dictionary/47349

benign prostatic hypertrophy. (ECF No. 76, ¶ 8; ECF No. 83, ¶ 8). On August 6, 2014, Mr. Bishop underwent an exploratory laparotomy, loop ileostomy formation, retroperitoneal node biopsy and repair of umbilical hernia. (ECF No. 76, ¶ 9; ECF No. 83, ¶ 9). Prior to Mr. Bishop's discharge, oncology from UPMC Hamot spoke directly with pathology regarding the biopsy results and was advised that "it does not appear to be a malignancy and instead of (sic)possible benign process (Castleman's) is included in the differential." (ECF No. 76, ¶ 10; ECF No. 83, ¶ 10). UPMC-Hamot records also note, however, that Mr. Bishop was "due to follow up with the Regional Cancer Center for final pathology results as well as with the General Surgery office for routine postop care." (ECF No. 82-2, p.6).

Upon his discharge from UPMC-Hamot on August 11, 2014, Mr. Bishop was returned to SCI-Albion where he was admitted to the infirmary. (ECF No. 76, ¶ 11; ECF No. 83, ¶ 11). On August 13, 2014, Dr. Maza examined Mr. Bishop, noted the recent surgery and course, and ordered current therapy to be maintained. (ECF No. 71, ¶ 53; ECF No. 80, ¶ 53). On August 14, 2014, Dr. Maxa reviewed the pathology report concerning Mr. Bishop. It noted as a final diagnosis: lymph node with follicular hyperplasia and no evidence of malignancy. The case had received interdepartmental review and been discussed with Philip H Symes, MD, an oncologist, on August 8, 2014. (ECF No. 71, ¶ 54; ECF No. 80, ¶ 54). Dr. Maxa also ordered a consult with Dr. Malhotra, another oncologist, on August 14, 2014, and the appointment was scheduled for August 25, 2014. (ECF No. 71, ¶ 55; ECF No. 80, ¶ 55). In the consult, Dr. Maxa noted that Mr. Bishop had been sent to the hospital due to abdominal pain and found to have a mass in his cecum/small bowel, that a bowel resection with ileostomy was done, and that the pathology report indicated a benign process. (ECF No. 71, ¶ 56; ECF No. 80, ¶ 56).

Dr. Maxa saw Mr. Bishop again on August 15, 2014 to monitor Mr. Bishop post-surgically and ordered maintenance of current therapy with nutritional supplement. (ECF No. 71, ¶ 57; ECF No. 80, ¶ 57). Lab work was done on August 15, 2014 with results reported back to Dr. Maxa on August 18, 2014. The results were abnormal but in Dr. Maxa's judgment no follow-up was needed. (ECF No. 71, ¶ 58; ECF No. 80, ¶ 58). Dr. Hakala saw Mr. Bishop as part of the post-surgical monitoring on August 16, 2014 and ordered a continued plan of care. (ECF No. 71, ¶ 59; ECF No. 80, ¶ 59).

PA Stroup saw Mr. Bishop on August 17, 2014, confirmed the colostomy bag was in place and ordered continuous monitoring. (ECF No. 71, ¶ 60; ECF No. 80, ¶ 60). Dr. Maxa examined Mr. Bishop on August 18, 2014 regarding his status post-surgery. He maintained Mr. Bishop's current treatment plan. (ECF No. 71, ¶ 61; ECF No. 80, ¶ 61). On August 19, 2014, Dr. Maxa saw Mr. Bishop in follow-up and ordered medication and maintenance of current treatment. (ECF No. 71, ¶ 62; ECF No. 80, ¶ 62).

On August 20, 2014, Mr. Bishop was seen for his general surgery follow-up at UPMC-Hamot, which recommended further follow-up with general surgery in one month, and again in four months, as well as to follow-up with urology. (ECF No. 71, ¶ 64; ECF No. 80, ¶ 64). That same day, Dr. Maxa requested a urology consult for Mr. Bishop as follow-up from the August procedures. The appointment took place on October 2, 2014, and the urologist ordered continuation of medications, including Bactrim. (ECF No. 71, ¶ 65; ECF No. 80, ¶ 65).

On August 26, 2014, Mr. Bishop was seen by the oncologist via telemedicine, and the next day Dr. Maxa noted the urology follow-up was pending. Dr. Maxa saw Mr. Bishop twice on August 26, first in the morning in follow-up and to encourage ambulation and intake and, second, at the request of nursing because Mr. Bishop had fallen. Dr. Maxa assessed general

8

weakness and increased caloric intake through prescriptions. The urology follow-up described above was approved on August 27, 2014. (ECF No. 71, ¶¶ 65-70; ECF No. 80, ¶¶ 65-70).

On August 27, 2014, Mr. Bishop was sent by Dr. Maxa to the Emergency Room at UPMC-Hamot for abdominal pain and acute renal failure. (ECF No. 76, ¶12; ECF No. 83, ¶12). Mr. Bishop was admitted to UPMC-Hamot that same day, and remained hospitalized until August 31, 2014. (ECF No. 76, ¶13; ECF No. 83, ¶13). The discharge summary noted that Mr. Bishop should follow up with Dr. Brian Ng, a gastroenterologist, within one month, and with Dr. Maxa within one week. (ECF No. 76, ¶14; ECF No. 83, ¶14).

B. Medical History: September 1, 2014 and Thereafter

Upon returning to SCI Albion, Mr. Bishop was housed in the infirmary from August 31, 2014 through October 28, 2014. (ECF No. 76, ¶16; ECF No. 83, ¶16). While there, Mr. Bishop was required to be seen by a provider daily. Dr. Maxa typically handled daily infirmary rounds. (ECF No. 76, ¶17; ECF No. 83, ¶17). Mr. Bishop was seen by Dr. Maxa on September 2, 2014. Dr. Maxa noted that Mr. Bishop was still complaining of some right lower quadrant and pelvic discomfort. Dr. Maxa's plan was to maintain the current treatment with current medications, which included, but was not limited to, antibiotics (Cefadroxil), a medication to help relieve symptoms of urinary tract infections (Phenazopyridine), a urinary retention medication (Finasteride), anti-nausea medication (Ondansetron), and aspirin. (ECF No. 76 ¶18; ECF No. 83 ¶18).

From August 31, 2014 through October 28, 2014, Mr. Bishop was seen and evaluated by medical care providers at SCI Albion on over 350 occasions. He was seen multiples times a day by nursing staff and daily by either a physician or physician assistant. (ECF No. 76, ¶19; ECF No. 83, ¶19). During September and October of 2014, Mr. Bishop underwent lab work, including

9

blood tests on at least three occasions and urine tests on at least five occasions. (ECF No. 76, ¶20; ECF No. 83, ¶20). During September and October of 2014, Mr. Bishop received a variety of different medications. (ECF No. 76, ¶21; ECF No. 83, ¶21). On September 24, 2014, Mr. Bishop was sent to UPMC-Hamot for a peripherally inserted central catheter ("PICC") line placement and dehydration, after Dr. Maxa noted that intravenous ("IV") access was attempted multiple times in lab draw without success. Dr. Maxa noted that IV access was needed for IV fluid and labs. (ECF No. 76, ¶22; ECF No. 83, ¶22).

On October 2, 2014, Dr. Maxa referred Mr. Bishop to a urologist, Dr. Lori Dulabon, at UPMC Hamot, for possible stent removal following Mr. Bishop's August 2014 stent placement and cystoscopy. Dr. Dulabon noted that the stents were out, there was no family history of prostate cancer, and that Mr. Bishop had a negative kidney CT on August 27, 2014, which revealed normal kidneys. Dr. Dulabon advised that Mr. Bishop should continue Flomax 0.8mg at bedtime, Bactrim DS twice a day for seven days, and, based upon Mr. Bishop's complaints of recurrent urinary tract infections and some episodes of gross hematuria, Dr. Dulabon sent Mr. Bishop's urine for repeat urine culture and cytologies. Mr. Bishop was given Tamsulosin (Flomax) and Sulfatrim DS (Bactrim DS), as ordered. (ECF No. 76, ¶¶ 23-26; ECF No. 83, ¶¶ 23-26).

Mr. Bishop's October 2, 2014 urine culture was "suspicious for malignant cells," (ECF No. 76, ¶27; ECF No. 83, ¶27), which prompted Dr. Maxa that same day to order a consultation with oncologist, Dr. Narinder Malhotra. (ECF No. 76, ¶28; ECF No. 83, ¶28). On October 21, 2014, Mr. Bishop was seen by Dr. Malhotra via telemed. PA Wright was also in attendance. At that time, Dr. Malhotra had discussed the case with Jennifer Naber, MD, a pathologist at UPMC-Hamot. Dr. Naber advised that she could not make a definite diagnosis of Castleman's

10

disease and it was decided to send the specimen obtained on August 6, 2014 to a lymphoma specialist at UPMC for a second opinion. At the time of the consult, the results were still pending. (ECF No. 76, ¶29; ECF No. 83, ¶29).

For Mr. Bishop's anemia, Dr. Malhotra recommended various blood tests and ferrous sulfate, an iron supplement. Dr. Malhotra also wanted a complete blood count ("CBC") to be completed every two weeks and a comprehensive metabolic panel ("CMP") and CT scan of the abdomen and pelvis done prior to Mr. Bishop's next visit. He was instructed to follow up in two (2) months. (ECF No. 76, ¶30; ECF No. 83, ¶30). That same day, PA Wright and/or Dr. Maxa placed orders for the bloodwork and CT scans, as ordered by Dr. Malhotra. (ECF No. 76, ¶31; ECF No. 83, ¶31). Also, on October 21, 2014, the iron supplement was ordered by PA Wright and was thereafter administered to Mr. Bishop as recommended by Dr. Malhotra. (ECF No. 76, ¶32; ECF No. 83, ¶32). Mr. Bishop's blood was taken on October 24, 2014, and the results were available on November 6, 2014. (ECF No. 76, ¶33; ECF No. 83, ¶33).

On October 28, 2014, Mr. Bishop was sent to the emergency room at UPMC-Hamot after advising Dr. Maxa that he was passing blood clots in his urine. Mr. Bishop was admitted to UPMC-Hamot on October 28, and a CT scan of Mr. Bishop's abdomen and pelvis was performed that same day. (ECF No. 76, ¶¶ 34-35; ECF No. 83, ¶¶ 34-35). The CT showed that the right pelvic mass had not significantly changed since the previous study in August 2014. (ECF No. 76, ¶36; ECF No. 83, ¶36).

On October 31, 2014, while at UPMC-Hamot, Mr. Bishop underwent a cystoscopy, performed by Dr. Dulabon, and a large bladder mass was biopsied. Pathology from the bladder mass revealed a well-differentiated adenocarcinoma.[9] (ECF No. 76, ¶¶ 37-38; ECF No. 83,

---

[9] Adenocarcinoma is defined as "a malignant neoplasm of epithelial cells with a glandular or glandlike pattern." See https://www.medilexicon.com/dictionary/1104.

11

¶¶ 37-38). Oncology was consulted and it was decided that Mr. Bishop would start palliative care, including radiation therapy to begin immediately. (ECF No. 76, ¶39; ECF No. 83, ¶39). While at UPMC-Hamot, Mr. Bishop was also treated for a urinary tract infection, bacteremia, and sepsis, and he finished a course of antibiotics before being discharged. (ECF No. 76, ¶40; ECF No. 83, ¶40). Additionally, while at UPMC-Hamot, Mr. Bishop was seen by orthopedics for leg pain. It was recommended that Mr. Bishop undergo an outpatient bone scan and follow up with orthopedics. Upon discharge, Mr. Bishop was to follow-up in one week with the Regional Cancer Center ("RCC"), orthopedics regarding a bone scan, and Dr. Maxa. (ECF No. 76, ¶¶ 41-42; ECF No. 83, ¶¶ 41-42).

Mr. Bishop was discharged from UPMC-Hamot on November 6, 2014, and was seen by Dr. Andrew Figura at the RCC that same day. The recommendation was to proceed with a course of palliative radiation therapy to the pelvic mass to optimize potential for local control, since Mr. Bishop had no surgical options. Dr. Marsh was to evaluate whether to proceed with chemotherapy. Dr. Figura noted that the RCC would proceed with a simulation session that day and initiate radiation treatments shortly. (ECF No. 76, ¶43; ECF No. 83, ¶43).

Mr. Bishop returned to SCI-Albion on November 6, 2014, and was housed in the infirmary of SCI Albion from date through January 3, 2015. (ECF No. 76, ¶44; ECF No. 83, ¶44). During this time period in the infirmary, Mr. Bishop was seen and evaluated by medical care providers at SCI-Albion on over 375 occasions. He was seen multiples times a day by nursing staff and daily by either a physician or physician assistant. (ECF No. 76, ¶45; ECF No. 83, ¶45).

Mr. Bishop was seen by Dr. Maxa in the infirmary on November 8, 2014, at which time he complained of swollen legs. Dr. Maxa's plan was to maintain current treatment and ordered

12

that Mr. Bishop be provided with TED (thrombo-embolic deterrent) hose. Later that day, Mr. Bishop was fitted for and received the TED hose. (ECF No. 76, ¶46; ECF No. 83, ¶46). During November and December of 2014, Mr. Bishop underwent lab work, including blood tests on at least three occasions and urine tests on at least one occasion, (ECF No. 76, ¶47; ECF No. 83, ¶47), and received a variety of different medications. (ECF No. 76, ¶48; ECF No. 83, ¶48). On November 7, 2014, Dr. Maxa placed consultation orders for follow up appointments with the RCC and for the recommended bone scan. (ECF No. 76, ¶49; ECF No. 83, ¶49).

Mr. Bishop began a course of palliative radiation to the bladder and pelvic mass on November 19, 2014. (ECF No. 76, ¶50; ECF No. 83, ¶50). On November 24, 2014, the recommended bone scan was completed. (ECF No. 76, ¶51; ECF No. 83, ¶51). On December 2, 2014, Dr. Figura discussed Mr. Bishop's case with Dr. Maxa. Dr. Figura requested to have Mr. Bishop evaluated by urology, noting that Mr. Bishop's "pain in the penis and while urinating was not likely totally related to the radiation." (ECF No. 76, ¶52; ECF No. 83, ¶52).

On December 3, 2014, Mr. Bishop was seen by Dr. Philip Symes at the RCC. In conferring with Dr. Figura, it was determined that "the best option [was] to complete the radiation and then reevaluate, restage with a CT scan." Dr. Symes planned to see Mr. Bishop back in three months and to "get a CT scan and hold off on any systemic treatment for the time being." Dr. Symes also noted that Mr. Bishop was being referred to Dr. Dulabon for his urologic/penile problem. (ECF No. 76, ¶53; ECF No. 83, ¶53). Also, on December 3, 2014, SCI-Albion attempted to schedule an appointment for Mr. Bishop with the urologist, Dr. Dulabon. However, Dr. Dulabon declined to see Mr. Bishop because he had no genitourinary ("GU") issues that she could resolve, that Mr. Bishop had unresectable colon

cancer eroding into his bladder, and that his pain needed to be treated by palliative care. (ECF No. 76, ¶ 54; ECF No. 83, ¶ 54).

On December 17, 2014, Mr. Bishop completed the course of palliative radiation to the bladder and pelvic mass. Dr. Figura noted that Mr. Bishop "tolerated the treatments fairly well, except he developed very severe burning with urination. He was treated for a urinary tract infection and then started on some pain medications and his urinary symptoms have improved." Dr. Figura wanted to see Mr. Bishop back in two months and noted that Dr. Maxa was going to order a CT scan for the follow-up. (ECF No. 76, ¶ 55; ECF No. 83, ¶ 55). That same day, Dr. Maxa completed the consultation order for Mr. Bishop's CT scan of the abdomen and pelvis for restaging as recommended by Dr. Figura, and the same was scheduled for February 10, 2015. (ECF No. 76, ¶ 56; ECF No. 83, ¶ 56).

On January 3, 2015, Mr. Bishop was seen and evaluated by Dr. Beth Hakala in the infirmary. Mr. Bishop was unresponsive and tachycardic. Dr. Hakala sent Mr. Bishop to UPMC-Hamot where he was admitted on January 3, 2015. (ECF No. 76, ¶¶ 57-58; ECF No. 83, ¶¶ 57-58). On January 3rd and 4th, Mr. Bishop underwent chest x-rays, a retroperitoneum ultrasound, an EKG, and a CT scan of his abdomen and pelvis. (ECF No. 76, ¶ 59; ECF No. 83, ¶ 59). Mr. Bishop was discharged from UPMC-Hamot and returned to the infirmary at SCI-Albion on January 7, 2015. Per the discharge summary, Mr. Bishop was ordered to follow-up with Dr. Maxa in one week. (ECF No. 76, ¶¶ 60-61; ECF No. 83, ¶¶ 60-61).

On January 8, 2015, Dr. Maxa saw Mr. Bishop in the infirmary and noted that he said he "felt good." Dr. Maxa's plan was to maintain current treatment and continue with the medications as prescribed. (ECF No. 76, ¶ 62; ECF No. 83, ¶ 62). Mr. Bishop was housed in the infirmary of SCI Albion from January 7, 2015 through February 24, 2015. (ECF No. 76, ¶ 63;

14

ECF No. 83, ¶ 63). During this time period in the infirmary, Mr. Bishop was seen and evaluated by medical care providers at SCI Albion on over 275 occasions. He was seen multiples times a day by nursing staff and daily by either a physician or physician assistant. (ECF No. 76, ¶ 64; ECF No. 83, ¶ 64). Between January 7, 2014 and Mr. Bishop's next hospitalization on April 10, 2015, Mr. Bishop underwent lab work, including blood tests on at least five occasions and urine tests on at least five occasions, and received a variety of different medications. (ECF No. 76, ¶¶ 65-66; ECF No. 83, ¶¶ 65-66).

On January 20, 2015, Mr. Bishop was seen via telemed by Dr. Malhotra, the oncologist. Dr. Malhotra noted that Mr. Bishop needed to be reevaluated and ordered blood work along with a CT scan of the chest, abdomen, and pelvis. Dr. Malhotra also noted that Mr. Bishop would be referred to medical oncology for evaluation to plan for further management. Mr. Bishop was to be seen in eight weeks. (ECF No. 76, ¶ 67; ECF No. 83, ¶ 67). Later that day, the requested blood work was collected. (ECF No. 76, ¶ 68; ECF No. 83, ¶ 69).

On February 10, 2015, Dr. Maxa ordered a follow-up consult with medical oncology, and the consult was scheduled for March 12, 2015. (ECF No. 76, ¶ 69; ECF No. 83, ¶ 69). On February 10, 2015, Mr. Bishop underwent a CT scan of the abdomen and pelvis. Dr. Barry Parks suspected that Mr. Bishop was developing hepatic metastatic disease. (ECF No. 76, ¶ 70; ECF No. 83, ¶ 70).

Mr. Bishop was again seen by Dr. Figura on February 23, 2015. Dr. Figura noted that "the large complex appearing necrotic mass in the pelvic region" had not changed significantly in size but looked somewhat more necrotic. Dr. Figura requested that Mr. Bishop follow-up with general surgery for evaluation of tissue on his abdominal wall, medical oncology through the prison to determine if the liver and lung lesion need biopsied versus considering possible

15

additional systematic therapy if warranted, and noted that Mr. Bishop may benefit from a urology consult to evaluate whether any palliative measures could be done to help improve his urinary flow. (ECF No. 76, ¶ 71; ECF No. 83, ¶ 71). Dr. Figura requested to see Mr. Bishop back in three months and to repeat a CT scan of the chest, abdomen, and pelvis to continue to monitor for restaging purposes. (ECF No. 76, ¶ 72; ECF No. 83, ¶ 72). Dr. Figura also noted that Mr. Bishop "thought he was improving since he has been gaining weight and feeling better, so it would be reasonable for him to return to the general population at the prison as tolerated." (ECF No. 76, ¶ 73; ECF No. 83, ¶ 73). Mr. Bishop was scheduled for follow-up appointments with medical oncology, surgery and urology. (ECF No. 76, ¶ 74; ECF No. 83, ¶ 74). He was discharged from the infirmary to general population on February 24, 2015. (ECF No. 76, ¶ 75; ECF No. 83, ¶ 75). On March 2nd and 11th, Mr. Bishop was seen by PA Furlan for follow-up regarding a heel wound. (ECF No. 76, ¶ 76; ECF No. 83, ¶ 76).

On March 12, 2015, Mr. Bishop was seen by Dr. Symes at the RCC for a follow-up. Dr. Symes noted that Mr. Bishop was "referred to interventional radiology at Hamot" and that he would "get him back afterwards." In the meantime, Dr. Symes planned to get in touch with Dr. Maxa "to see what we can do locally as far as treatment." (ECF No. 76, ¶ 77; ECF No. 83, ¶ 77).

On March 25, 2015, Joseph Furlan, PA-C saw Mr. Bishop for chronic dysuria and lower abdominal pain. PA Furlan ordered a urine culture to rule out a urinary tract infection. Mr. Bishop was instructed to follow-up as needed. (ECF No. 76, ¶ 78; ECF No. 83, ¶ 78).

On April 1, 2015, Mr. Bishop was transported to UPMC-Hamot for a needle guided liver biopsy. (ECF No. 76, ¶ 79; ECF No. 83, ¶ 79). Mr. Bishop returned to SCI-Albion that same day and was admitted to the infirmary for 23-hour observation. (ECF No. 76, ¶ 80; ECF No. 83,

¶ 80). The following day, April 2, 2015, Mr. Bishop was seen by Dr. Maxa. He reported that he was doing well, and he was discharged from the infirmary and returned to general population. (ECF No. 76, ¶ 81; ECF No. 83, ¶ 81).

On April 7, 2015, Mr. Bishop was seen by PA Furlan for a follow-up regarding his UTI. PA Furlan renewed Mr. Bishop's course of Bactrim for 14 days, ordered a urine culture and urinalysis, and ordered Ensure to be consumed at the medical window three times a day. PA Furlan also offered to admit Mr. Bishop back into the infirmary, but Mr. Bishop declined this offer. (ECF No. 76, ¶ 82; ECF No. 83, ¶ 82).

At approximately 9:00 p.m. on April 9, 2015, Mr. Bishop was seen by a nurse in the medical department and complained that he had been unable to eat for two days, was feeling weak, and had no energy. The nurse took Mr. Bishop's vital signs and advised Mr. Bishop to place a sick call to be seen by a physician assistant in the morning. (ECF No. 76, ¶ 83; ECF No. 83, ¶ 83). Mr. Bishop was again seen and evaluated by nursing staff a few hours later, at approximately 1:30 a.m. on April 10, 2015, after a block officer had discovered Mr. Bishop on the floor in his cell. Mr. Bishop's ostomy appliance was changed, his vitals were taken, and although he seemed drowsy, Mr. Bishop was answering questions appropriately. Mr. Bishop was instructed to stay in his bunk and was advised that a physician assistant would see him in the morning. (ECF No. 76, ¶ 84; ECF No. 83, ¶ 84).

At approximately 8:25 a.m. on April 10, 2015, Mr. Bishop was seen and evaluated by Dr. Maxa. Dr. Maxa noted that Mr. Bishop was drowsy and lethargic but awoke to verbal stimuli and answered questions slowly. Dr. Maxa ordered Mr. Bishop to be sent to UPMC-Hamot. Mr. Bishop was admitted to UPMC-Hamot on April 10, 2015, and remain until April 20, 2015. He was again found to have acute kidney injury and left hydronephrosis

17

(swelling of the kidney due to build-up of urine). (ECF No. 76, ¶¶ 85-86; ECF No. 83, ¶¶ 85-86).

On April 10, 2015, during a nephrology consult, Dr. Peter Barzyk noted that "[b]ecause of the invasion [of the adenocarcinoma] into the bladder, [Mr. Bishop] had multiple urological issues.... He has continued to have recurrent urinary tract infections and abnormal urinalysis, not unexpectedly because of the bladder lesions." (ECF No. 76, ¶87; ECF No. 83, ¶87). On April 11, 2015, Dr. David Seastone saw Mr. Bishop for a hematology/oncology consult. Dr. Seastone determined that Mr. Bishop's "current AKI [acute kidney injury] precludes effective use of palliative chemotherapy at this time. We will follow along with patient and when his mental status improves discuss with him about follow-up care and make arrangements." (ECF No. 76, ¶ 88; ECF No. 83, ¶ 88).

On April 16, 2015, as part of a palliative care consult, John Barnett of UPMC-Hamot spoke to Mr. Bishop's sister (Plaintiff, Iris Bishop) and mother and explained the critical nature of Mr. Bishop's medical condition. It was noted that Mr. Bishop's sister and mother wanted to "discuss matters further among themselves and their pastor prior to making any changes in code status or treatment plan." (ECF No. 89, ¶ 53; ECF No. 83, ¶ 89). Per UPMC's Discharge Clinical Summary, Mr. Bishop was to follow up in one week with Dr. Maxa at SCI-Albion and in six months with urologist, Dr. Peter Bridges, for a cystoscopy with stent exchange. (ECF No. 76, ¶ 90; ECF No. 83, ¶ 90).

Mr. Bishop returned to SCI-Albion on April 20, 2015 and was admitted to the infirmary. (ECF No. 76, ¶ 91; ECF No. 83, ¶ 91). While in the infirmary, Mr. Bishop was seen by Dr. Maxa or a physician assistant daily and by nursing staff multiple times a day. (ECF No. 76, ¶ 92; ECF No. 83, ¶ 92). Dr. Maxa saw Mr. Bishop on April 21, 2015, ordered Mr. Bishop's

medication, reviewed his hospital records, and noted Mr. Bishop's full code status. Dr. Maxa also ordered blood work to be completed the following day. (ECF No. 76, ¶93; ECF No. 83, ¶93).

On April 22, 2015, Dr. Maxa ordered that Mr. Bishop have a 24-hour hospice worker to assist with his needs and safety, noting that Mr. Bishop was a fall risk. Mr. Bishop was seen by Dr. Maxa again on April 22nd, 23rd, 24th, and 25th and had no specific complaints. Mr. Bishop was seen by PA Furlan on April 26, 2015 and stated that he was fatigued. PA Furlan evaluated Mr. Bishop and planned to continue with the current treatment plan. Mr. Bishop was seen by Dr. Maxa on April 27, 2015 and had no specific complaints. He advised Dr. Maxa that he was going to talk with his family about DNR (do not resuscitate) status. (ECF No. 76, ¶¶ 94-97; ECF No. 83, ¶¶ 94-97).

From April 28th through April 30th, Mr. Bishop was seen by Dr. Maxa and had no complaints. Mr. Bishop was seen by Dr. Maxa on May 1, 2015 and complained of difficulty with urination. That same day, Dr. Maxa ordered a Texas catheter for Mr. Bishop. On May 3, 2015, Mr. Bishop was seen in the infirmary by Dr. Maxa and had no complaints. (ECF No. 76, ¶¶ 98-100; ECF No. 83, ¶¶ 98-100). On May 4th, Mr. Bishop was seen by Dr. Maxa and complained of increased foot pain, but stated that overall his pain was "okay." Dr. Maxa planned to continue with pain medications and adjust to comfort. On May 5th and 7th, Mr. Bishop was seen by Dr. Maxa and had no complaints. On May 7, 2015, Dr. Maxa ordered that Mr. Bishop be turned and repositioned every two hours. (ECF No. 76, ¶¶ 101-103; ECF No. 83, ¶¶ 101-103).

Mr. Bishop passed away at SCI-Albion on May 8, 2015. (ECF No. 76, ¶ 104; ECF No. 83, ¶ 104).

V.    DISCUSSION

   A. Grounds for Summary Judgment

   Correct Care's motion advances two grounds in support of its request for summary judgment: (1) Plaintiff's Eighth Amendment claim fails because the record is insufficient to sustain a finding that Correct Care was deliberately indifferent to Mr. Bishop's serious medical needs; and (2) Plaintiff's § 1983 claim fails because Plaintiff has not produced evidence that Mr. Bishop received deficient care pursuant to a policy or custom of Correct Care. These contentions are related. Because the court finds that each has merit and that Correct Care is entitled to judgment as a matter of law, the court will grant Correct Care's motion.

   B. Section 1983 and Eighth Amendment Liability

      i.    Deliberate Indifference to Serious Medical Need

   Plaintiff prosecutes her Eighth Amendment claim against Correct Care pursuant to 42 U.S.C. § 1983. [10] Rather than conferring any substantive rights, § 1983 "provides a method for vindicating federal rights elsewhere conferred." *Hildebrand v. Allegheny Cnty.*, 757 F.3d 99, 104 (3d Cir. 2014) (citing *Albright v. Oliver*, 510 U.S. 266, 271 (1994)) (internal quotation marks and citations omitted). A plaintiff may prevail on a claim for relief under § 1983 by showing that he or she was (1) deprived of a federal right (2) by a person acting under color of state law. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). There is no dispute that Correct Care is "a person acting under color of state law." *See Johnson v. Stempler*, 373 Fed. Appx. 151, 153-54 (3d Cir. 2010) (private prison doctors working under contract with the government act "under

---

[10] 42 U.S.C. § 1983 provides, in pertinent part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .".

color of state law" for purposes of § 1983 and may be sued under that statute) (citing *West v. Atkins*, 487 U.S. 42, 54-57 (1988)). The question is, therefore, whether a reasonable jury could conclude that record evidence supports Plaintiff's claim that Correct Care deprived Mr. Bishop of his rights under the Eighth Amendment. *See, e.g., Baskerville v. Young*, 2018 WL 3343235, at *2 (3d Cir. 2018) (citing *Helling v. McKinney*, 509 U.S. 25, 32 (1993)).

"The Eighth Amendment, through its prohibition on cruel and unusual punishment, prohibits the imposition of 'unnecessary and wanton infliction of pain contrary to contemporary standards of decency.'" *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Helling v. McKinney*, 509 U.S. 25, 32 (1993)). In the context of an adequacy of care claim under the Eighth Amendment, an inmate must produce evidence that a defendant was "deliberately indifferent" to the inmate's serious medical needs in order to survive a motion for summary judgment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "[A] medical need is 'serious' for the purposes of a denial of medical care claim if it is either 'one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention.'" *Mattern v. City of Sea Isle*, 657 Fed. Appx 134, 139 (3d Cir. 2016) (quoting *Monmouth Cty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987)). Here, the record evidence easily suffices to support a finding that Mr. Bishop had serious medical needs related to his chronic abdominal, urologic and other conditions, which were ultimately determined to include adenocarcinoma that likely originated in his colon and spread to his bladder.

Next, the record must contain evidence to permit a reasonable jury to determine that Correct Care acted with deliberate indifference to Mr. Bishop's serious medical needs. Importantly, when it comes to claims of deliberate indifference, there is a "critical distinction"

21

between allegations of a delay or denial of a recognized need for medical care and allegations of inadequate medical treatment. *Pearson.*, 850 F.3d at 535 (quoting *United States ex rel. Walker v. Fayette Cty.*, 599 F.2d 573, 575 n.2 (3d Cir. 1979)). A claim alleging the delay or denial of medical treatment requires inquiry into the subjective state of mind of the defendant and the reasons for the delay, which like other forms of scienter can be proven through circumstantial evidence and witness testimony. *Id.* But "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.* (citing *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976)). Furthermore, courts "disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment ... [which] remains a question of sound professional judgment." *Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (quoting *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)) (alterations in original).

Nonetheless, as the Court of Appeals has made clear, the fact that prison medical personnel have provided some medical care to an inmate does not preclude a finding of deliberate indifference:

> [T]here are circumstances in which some care is provided yet it is insufficient to satisfy constitutional requirements. For instance, prison officials may not, with deliberate indifference to the serious medical needs of the inmate, opt for "an easier and less efficacious treatment" of the inmate's condition. *West v. Keve*, 571 F.2d 158, 162 (3d Cir. 1978) (quoting *Williams v. Vincent*, 508 F.2d 541, 544 (2d Cir. 1974)). Nor may "prison authorities deny reasonable requests for medical treatment ... [when] such denial exposes the inmate 'to undue suffering or the threat of tangible residual injury.'" *Monmouth County Corr. Inst. Inmates*, 834 F.2d at 346 (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976)).

*Palakovic v. Wetzel*, 854 F.3d 209, 228 (3d Cir. 2017).

## ii. Plaintiff's Assertions of Deliberate Indifference

Plaintiff identifies three areas where she asserts Correct Care demonstrated deliberate indifference to Mr. Bishop's serious medical needs. First, Plaintiff asserts that Correct Care failed to react promptly and appropriately to medical findings indicative of cancer. Correct Care responds to this assertion by pointing out that Mr. Bishop was diagnosed with adenocarcinoma on October 31, 2014, while he was hospitalized at UPMC-Hamot, and that he was promptly referred to the RCC for a course of palliative radiation therapy following this diagnosis. Radiation therapy commenced shortly after this referral and continued through December 17, 2014. Correct Care's timeline is correct, and the record well-documents that Mr. Bishop received consistent care and medical attention following the diagnosis of adenocarcinoma.

The record is less clear regarding whether Mr. Bishop's cancer could have been diagnosed earlier—between September 1, 2014, when Correct Care took over medical services from Wexford, and Mr. Bishop's hospitalization on October 28, 2014. There is no evidence in the record, however, that Correct Care ignored or otherwise acted with deliberate indifference towards a possible cancer diagnosis or any other medical need or condition of Mr. Bishop during this timeframe. Between August 31, 2014 and October 28, 2014, Mr. Bishop was seen and evaluated by medical staff at SCI-Albion on over 350 occasions and was repeatedly referred to outside facilities and specialists, including to a urologist, Dr. Lori Dulabon, on October 2, 2014.

Plaintiff correctly notes in her brief that Dr. Maxa, the Site Medical Director, was employed by Wexford until August 31, 2014, and that he continued in this position after that date as a Correct Care employee. Plaintiff is also correct that Correct Care must be regarded as having Dr. Maxa's knowledge of Mr. Bishop's medical history based upon the continuity of his

employment. Nevertheless, the record simply will not sustain a finding of deliberate indifference to conditions that might have alerted Correct Care to Mr. Bishop's cancer before his formal diagnosis. By the time Correct Care took over medical services from Wexford, outside medical providers were already attempting to diagnosis the cause or causes of his symptoms. In August, 2014, before Correct Care began its medical services contract, Mr. Bishop was hospitalized at UPMC-Hamot where he was assessed for possible cancer. Prior to his discharge from UPMC-Hamot, oncology spoke directly with pathology regarding Mr. Bishop's biopsy results and was advised that "it does not appear to be a malignancy and instead of (sic)possible benign process (Castleman's) is included in the differential." (ECF No. 76, ¶ 10; ECF No. 83, ¶ 10).

While UPMC-Hamot records also note that Mr. Bishop was "due to follow up with the Regional Cancer Center for final pathology results as well as with the General Surgery office for routine postop care" (ECF No. 82-2, p.6), the record does not support Plaintiff's contention that Correct Care disregarded this notation. Instead, it is undisputed that on August 20, 2014, Mr. Bishop was seen for his general surgery follow-up at UPMC-Hamot. (ECF No. 71, ¶ 64; ECF No. 80, ¶ 64). That same day, Dr. Maxa requested a urology consult for Mr. Bishop as follow-up from the August procedures. The urology appointment took place on October 2, 2014. (ECF No. 71, ¶ 65; ECF No. 80, ¶ 65). Although the consultation did not occur at the RCC, Mr. Bishop was seen by an oncologist via telemedicine on August 26, 2014, and Dr. Maxa saw Mr. Bishop twice that same day. (ECF No. 71, ¶¶ 65-70; ECF No. 80, ¶¶ 65-70). The next day, August 27, 2014, Mr. Bishop was sent by Dr. Maxa to the Emergency Room at UPMC-Hamot for abdominal pain and acute renal failure. Mr. Bishop was admitted to

UPMC- Hamot where he received further treatment and assessment of his conditions. (ECF No. 76, ¶12; ECF No. 83, ¶12).

Plaintiff also argues that Correct Care failed to abide by medical directives issued by UPMC-Hamot and the RCC. When Mr. Bishop was discharged from UPMC-Hamot on August 31, 2014, the discharge summary directed that he should follow-up with Dr. Maxa within one week and with Dr. Brian Ng, a gastroenterologist, within one month. Mr. Bishop returned to SCI-Albion on August 31, 2014, and was seen by Dr. Maxa two days later, on September 2, 2014. Mr. Bishop was housed in the infirmary from August 31until October 28, 2014. Mr. Bishop ultimately did not see Dr. Ng for the gastroenterology (GI) follow-up. In his deposition, however, Dr. Maxa explained that this visit was contemplated only if those directing Mr. Bishop's GI care decided to reverse his ileostomy, and the follow-up became unnecessary when it was decided that the ileostomy would not be reversed. (ECF No. 77-10, p. 125). The record does not contain any evidence to the contrary, or evidence to indicate that the GI consultation was denied for an improper reason.

As noted above, Mr. Bishop was seen by an oncologist via telemedicine on August 26, 2014, and after his diagnosis of adenocarcinoma in late October, 2014, he was referred to the RCC for a course of palliative radiation. The record includes nothing to support a finding that Correct Care failed to heed or follow any recommendations by the oncologist, the RCC or UPMC-Hamot following this or any of Mr. Bishop's hospitalizations or consults. Plaintiff notes that chemotherapy was ultimately ruled out as a viable treatment option for Mr. Bishop and implies that its unavailability was due to a delay in offering or considering it. Plaintiff has not, however, identified anything in the record to support that the RCC, UPMC-Hamot or any other

provider recommended chemotherapy for Mr. Bishop. Correct Care therefore cannot be found to have ignored or defied such a recommendation.

Finally, Plaintiff contends that Correct Care was deliberately indifferent to Mr. Bishop's chronic conditions, including weight loss, abdominal pain and recurring urinary tract infections. The record also does not support this contention. As set forth in detail above, Mr. Bishop consistently received medical attention and treatment for his chronic conditions after Correct Care assumed its role on September 1, 2014. Mr. Bishop had already experienced dramatic weight loss prior to this date, and the record reflects that, in addition to treating the conditions that were believed to be causing the weight loss, medical personnel at SCI-Albion also prescribed and provided Mr. Bishop with "Resource Nutritional Supplement 2.0," a calorie and protein-dense drink, from September 17, 2014 through May 8, 2015, and prescribed Megace, an appetite stimulant, throughout September 2014 through November 2014. (ECF No. 77-6, pp.4, 10, 15, 22, 32, 37, 40, 42, 46, 48, 51, 53).

Likewise, as thoroughly documented in the medical records summarized above, Mr. Bishop consistently received attention and treatment for his abdominal pain and recurring urinary tract infections after September 1, 2014. While Plaintiff may challenge whether the treatment plans implemented after this date represented the best or most prudent decisions for Mr. Bishop's care under the circumstances, the record cannot sustain a finding that Correct Care was deliberately indifferent to Mr. Bishop's serious medical needs. The entry of summary judgment for Correct Care is therefore appropriate on Plaintiff's Eighth Amendment claim.

   iii. Corporate Liability—Policy or Custom

In addition to an insufficiency of the evidence regarding the "deliberate indifference" element of Plaintiff's Eighth Amendment claim, Correct Care is also entitled to summary

26

judgment based upon the "policy or custom" element necessary to support corporate liability under § 1983. Correct Care is a private, for-profit corporation that entered into a contract with the Pennsylvania DOC to provide medical services to inmates at SCI-Albion and other state correctional institutions. "To state a claim against a private corporation providing medical services under contract with a state prison system, a plaintiff must allege *a policy or custom* that resulted in the alleged constitutional violations at issue." *Palakovic v. Wetzel*, 854 F.3d 209, 232 (3d Cir. 2017) (emphasis supplied) (citing *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 583–84 (3d Cir. 2003)). Thus, "[w]hile a private corporation cannot be held vicariously liable for the actions of its staff, it may be held liable if 'it knew of and acquiesced in the deprivation of the plaintiff's rights.'" *Roach v. SCI Graterford Med. Dep't*, 398 F. Supp. 2d 379, 388 (E.D. Pa. 2005) (quoting *Miller v. City of Philadelphia*, No. CIV.A.96–3578, 1996 WL 683827, at *3–4 (E.D.Pa. Nov.26, 1996)). To meet this burden, the plaintiff must show that the corporation, "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [plaintiff's] constitutional harm." *Id.* (quoting *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir.1989)). In this respect, a private corporation performing the functions of a state government is treated as the state and, like the state, it may be liable under § 1983 only if its subordinates acted pursuant to its policies, customs or practices and those actions resulted in the plaintiff's constitutional injury.

The Court of Appeals has identified three situations where acts of a government employee may be deemed to be the result of a policy or custom of the governmental entity for whom the employee works, thereby rendering the entity liable under § 1983: (1) "where the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy," (2) "where no rule has

been announced as policy but federal law has been violated by an act of the policymaker itself," or (3) "where the policymaker has failed to act affirmatively at all, though the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need." *Natale*, 318 F.3d at 584 (internal quotation marks and citations omitted). The plaintiff bears the burden of proving that a "policymaker" is responsible for the policy or the custom that caused the alleged constitutional violation. *Wareham v. Pennsylvania Dep't of Corr.*, 2014 WL 3453711, at *5–6 (W.D. Pa. July 15, 2014).

Plaintiff's Second Amended Complaint alleged generally that Correct Care maintained policies and practices that elevated cost containment over proper medical care of inmates and plausibly inferred that Correct Care personnel deferred or denied to Mr. Bishop necessary diagnostic tests, consults and referrals pursuant to that policy. Courts have found plausible claims of medical indifference where prison physicians refuse to provide adequate care for non-medical reasons, such as cost containment. In *Shultz v. Allegheny County*, 835 F. Supp. 2d 14 (W.D. Pa. 2011), for example, the court addressed the question of whether the prison medical defendants' failure to provide appropriate treatment of the plaintiff's pneumonia symptoms, ultimately leading to her death, constituted deliberate indifference. *Id.* at 17. The plaintiff's representative alleged that despite the plaintiff's various symptoms, the prison medical staff, in an effort to control and contain costs, delayed performing diagnostic tests and transferring the plaintiff to an outside hospital. *Id.* The defendants contended that merely pointing to a policy of implementing cost savings fails to satisfy the threshold needed to plead an adequate deliberate indifference claim. *Id.* at 22. The court, however, found "the facts alleged and the reasonable

inferences drawn therefrom are enough to nudge the Eighth Amendment claim across the line between a possible and plausible claim for relief" and create a "reasonably founded hope that the [discovery] process will reveal relevant evidence to support the claim." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 n.8 (2007). See also, *Robinson v. Corizon Health, Inc.*, 2016 WL 7235314, at \*7 (E.D. Pa. Dec. 13, 2016) (inmate's complaint stated plausible claim of deliberate indifference where it alleged the medical defendants discovered plaintiff had kidney cancer but knowingly and willfully refused to use preventative medicine or send plaintiff to out-of-prison medical centers and doctors for prompt and adequate testing because they receive financial bonuses for avoiding use of such measures).

The complaints at issue in *Schultz* and *Robinson* survived dismissal on motions pursuant to Rule 12(b)(6). In contrast, the present case is before the court on Correct Care's motion for summary judgment. In this posture, the Plaintiff cannot rest on the allegations of her Second Amended Complaint to defeat Correct Care's motion. Because the existence of a policy or custom is a necessary element of Plaintiff's Eighth Amendment claim against Correct Care, and Correct Care has properly challenged this element in its motion, it was incumbent upon Plaintiff to identify evidence in the record sufficient to support its existence. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). Here, Plaintiff has failed to identify any evidence to demonstrate that Mr. Bishop sustained a constitutional injury as a result of a policy or custom fairly attributable to Correct Care. Plaintiff has not, for example, linked any alleged deficiency in Mr. Bishop's care to any actual policy or custom of Correct Care or even identified a Correct Care "policymaker."

29

"In order to ascertain who is a policymaker, 'a court must determine which official has final, unreviewable discretion to make a decision or take action.'" *Kneipp v. Tedder*, 95 F.3d 1199, 1212 (3d Cir.1996) (citing *Andrews v. City of Phila.*, 895 F.2d 1469, 1480 (3d Cir.1990)). According to the Supreme Court, "'whether a particular official has final policymaking authority is a question of state law.'" *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (quoting *St. Louis v. Praprotnik*, 485 U.S. 112 (1988) (plurality opinion)). Thus, to ascertain if an official has "final policymaking" authority, the court must determine "(1) whether as a matter of state law, the official is responsible for making policy in the particular area of ... business in question, and (2) whether the official's authority to make policy in that area is final and unreviewable." *Hill v. Borough of Kutztown*, 455 F.3d 225, 245 (3d Cir.2006) (internal citations omitted).

In the private employer context, "the relevant 'policymaker' inquiry is whether [the employee], as a matter of state and local positive law, or custom or usage having the force of law, exercised final policymaking authority." *Wallace v. Powell*, 2012 WL 2590150, at *14 (M.D. Pa. July 3, 2012) (quoting *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 729 (4th Cir.1999)). And, the Third Circuit has indicated that an individual, even without final policymaking authority, can bind his or her employer when the entity delegates authority or acquiesces in the individual's conduct. See *Laverdure v. Cnty. of Montgomery*, 324 F.3d 123, 125 (3d Cir.2003).

In the present case, Plaintiff has neither argued that a particular individual or group within Correct Care was a final policymaker or identified evidence to support that a particular individual or group occupied this status. See *Martin v. Sec'y of Corr.*, 2018 WL 2465180, at *3 (M.D. Pa. June 1, 2018) (complaint against private corporation providing medical services to inmates failed to state a § 1983 claim where it "failed to make reference to any final

30

policymaker, by name, title or otherwise, that was aware of the alleged deliberate indifference to his medical needs and acquiesced to it"). Similarly, Plaintiff has not asserted that final policymaking authority had been delegated to a particular individual or group within Correct Care.

Although Plaintiff's Second Amended Complaint alleged generally that Correct Care had policies and practices that elevated cost containment over proper medical care of inmates, Plaintiff has not identified any evidence in the record to support a triable issue of fact regarding this allegation. As Correct Care properly raised the sufficiency of the evidence regarding this necessary element of liability in its motion, and Plaintiff has failed to put forth evidence to support its existence, Rule 56(a) mandates the entry of summary judgment in favor of Correct Care.

VI.     CONCLUSION

Defendant Correct Care's motion for summary judgment [ECF No. 74] is hereby GRANTED. A final judgment will be entered in favor of Defendant Correct Care and against Plaintiff Iris Bishop, as Administratrix of the Estate of Michael Anthony Bishop, in a separate order in accordance with Fed. R. Civ. P. 58.

An order will follow.

Richard A. Lanzillo
United States Magistrate Judge

Dated this 19th day of February, 2019