IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IRIS BISHOP, Administratrix of the )
Estate of MICHAEL ANTHONY BISHOP, )
             Plaintiff )   No. 1:17-cv-60
              )
             v. )   Richard A. Lanzillo
              )   United States Magistrate Judge
WEXFORD HEALTH SOURCES, INC., et al. )
            Defendants )

## MEMORANDUM OPINION

I.    Introduction

Michael Anthony Bishop succumbed to cancer while he was in the custody of the Pennsylvania Department of Corrections (DOC) and incarcerated at the DOC's State Correctional Institution at Albion, Pennsylvania (SCI-Albion). Mr. Bishop's sister, Iris Bishop, commenced this action as administratrix of his estate. She asserted federal constitutional claims against defendants Wexford Health Sources, Inc. and Correct Care Solutions, LLC based upon their alleged deliberate indifference to Mr. Bishop's serious medical needs.[1] Ms. Bishop also asserted a medical malpractice claim under Pennsylvania state law against UPMC Hamot (Hamot). Hamot's motion for summary judgment, which is currently pending before the Court, asserts that the report of Ms. Bishop's sole expert fails to raise a genuine issue of material fact concerning essential elements of her medical malpractice claim. Because Ms. Bishop's expert report does not offer any opinion regarding the applicable standard of care or any deviation from

---

[1] By separate Memorandum Orders, the Court previously granted summary judgment in favor of Wexford and Correct Care. As to Wexford, Ms. Bishop's claim failed due to the absence of evidence to support a finding that Mr. Bishop's constitutional injury was the result of a policy or custom attributable to Wexford. *Bishop v. Wexford Health Sources, Inc.*, 2019 WL 500050, at *9 (W.D. Pa. Feb. 8, 2019), appeal dismissed, 2019 WL 4464219 (3d Cir. Apr. 4, 2019). As to Correct Care, the court determined that the undisputed facts were such that no reasonable jury could find that Correct Care acted with deliberate indifference to Mr. Bishop's serious medical needs and that the record also contained no evidence to support a finding that Mr. Bishop's constitutional injury was the result of a policy or custom attributable to Correct Care. *Bishop v. Wexford Health Sources, Inc.*, 2019 WL 670094, at *12 (W.D. Pa. Feb. 19, 2019).

1

that standard and fails to express a legally sufficient opinion regarding the "increased risk" of harm necessary to support causation, the Court will grant Hamot's motion.

II. Background

In support of her claim against Hamot, Ms. Bishop has submitted the expert report of Edward P. Gelmann, MD.[2] (ECF No. 101). Dr. Gelmann reviewed certain medical records concerning Mr. Bishop's care. Although his report does not specifically identify the records he reviewed, it does note that they "included records from The Regional Cancer Center and UPMC."[3] Before addressing the substance of Dr. Gelmann's report, for context, the Court will summarize the record as it relates to medical services provided to Mr. Bishop following his initial admission to Hamot.

Mr. Bishop was first admitted to Hamot on August 5, 2014. Over many months prior to this admission, personnel in the medical department of SCI-Albion had treated Mr. Bishop for a variety of conditions, including severe refractory mid-abdominal pain, a helicobacter pylori or "H. pylori" infection, an Escherichia coli or "E. coli" infection, and a history of severe weight loss. During a visit to SCI-Albion's medical department on August 5, 2014, Mr. Bishop's symptoms were determined to present an "emergency," necessitating his transport by ambulance

---

[2] Dr. Gelmann's report does not include, and the parties have not provided, a curriculum vitae or other summary of Dr. Gelmann's qualifications. The website for The University of Arizona Health Sciences lists Dr. Gelmann as "a professor of medicine in the Division of Hematology and Oncology at the University of Arizona College of Medicine – Tucson" and as having received his undergraduate education at Yale University and his medical education at Stanford University School of Medicine. https://deptmedicine.arizona.edu/profile/edward-p-gelmann-md. Hamot's motion does not challenge Dr. Gelmann's qualifications to offer expert testimony in this case.

[3] Extensive records from The Regional Cancer Center, Hamot, Wexford and Correct Care were previously made a part of the record in connection with the summary judgment motions filed on behalf of Wexford and Correct Care. The Court will reference these records and prior related submissions of the parties where necessary to provide context to matters raised in Hamot's motion.

2

to Hamot where he was admitted and where he remained until his discharge on August 11, 2014. (ECF No. 82-1, pp. 1-12; ECF No. 82-2, p.1).

Per the discharge summary, Mr. Bishop was found to have "a small bowel obstruction likely lymphoma, acute kidney injury, and accelerated hypertension." (ECF No. 82-2, p.6). On August 6, 2014, he underwent an exploratory laparotomy, loop ileostomy formation, retroperitoneal node biopsy, and repair of umbilical hernia. (*Id.*). During this procedure, the small bowel obstruction was found to be secondary to an intra-abdominal mass which was not biopsied at that time due to concern about injuring Mr. Bishop's colon. (ECF No. 106, ¶ 10; ECF No. 107-1, ¶ 10; ECF No. 106-8, pp. 1-2). The discharge summary noted:

> Also towards [Mr. Bishop's] discharge time, the oncologist spoke directly with pathology due to awaiting the final pathology. Per their records, it does not appear to be a malignancy and instead of (sic) possible benign process (Castleman's) is included in the differential. He is to follow up with these results. He is stable for discharge back to the prison on August 11, 2014. He is due to follow up with the Regional Cancer Center for final pathology results as well as with the General Surgery office for routine postop care.

(*Id.*). Hamot records also state that Mr. Bishop was to follow-up with the Regional Cancer Center within one-week. (ECF. No. 82-2, p. 2).

Upon his discharge from Hamot, Mr. Bishop was returned to SCI-Albion where he was admitted to the infirmary. (ECF No. 76, ¶ 11; ECF No. 83, ¶ 11). Thereafter, he was seen by multiple medical providers, including Philip H Symes, MD, an oncologist at The Regional Cancer Center, and Dr. Narinder K Malhotra MD, an oncologist from Titusville, Pennsylvania. (*Id.*; ECF No. 71, ¶ 55; ECF No. 80, ¶ 55). On August 14, 2014, Dr. Maxa, the prison physician, reviewed the pathology report concerning Mr. Bishop. It noted as a final diagnosis: lymph node with follicular hyperplasia and no evidence of malignancy. The report also noted that the case

3

was reviewed with Dr. Symes, the oncologist, on August 8, 2014. (ECF No. 71, ¶ 54; ECF No. 80, ¶ 54). Dr. Maxa also ordered the consult with Dr. Malhotra on August 14, 2014, and the appointment was scheduled for August 25, 2014. (ECF No. 71, ¶ 55; ECF No. 80, ¶ 55).

Dr. Maxa saw Mr. Bishop again on August 15, 2014 to monitor Mr. Bishop post-surgery and ordered maintenance of current therapy with nutritional supplement. (ECF No. 71, ¶ 57; ECF No. 80, ¶ 57). Lab work was done on August 15, 2014 with results reported back to Dr. Maxa on August 18, 2014. The results were abnormal but in Dr. Maxa's judgment no follow-up was needed. (ECF No. 71, ¶ 58; ECF No. 80, ¶ 58). Dr. Beth Hakala saw Mr. Bishop at the prison as part of the post-surgical monitoring on August 16, 2014 and ordered a continued plan of care. (ECF No. 71, ¶ 59; ECF No. 80, ¶ 59).

On August 20, 2014, Mr. Bishop was seen for his general surgery follow-up at Hamot, which recommended further follow-up with general surgery in one month, and again in four months, as well as to follow-up with urology. (ECF No. 71, ¶ 64; ECF No. 80, ¶ 64). That same day, Dr. Maxa requested a urology consult for Mr. Bishop as follow-up from the August procedures. The appointment took place on October 2, 2014, and the urologist ordered continuation of certain medications. (ECF No. 71, ¶ 65; ECF No. 80, ¶ 65).

On August 26, 2014, Mr. Bishop was seen by the oncologist via telemedicine, and the next day Dr. Maxa noted the urology follow-up was pending. The urology follow-up was ultimately approved on August 27, 2014. (ECF No. 71, ¶¶ 65-70; ECF No. 80, ¶¶ 65-70). However, on August 27, 2014, Mr. Bishop was sent by Dr. Maxa to the emergency department at Hamot for abdominal pain and acute renal failure. (ECF No. 76, ¶ 12; ECF No. 83, ¶ 12). Mr. Bishop was admitted to UPMC-Hamot that same day and remained hospitalized until August 31, 2014. (ECF No. 76, ¶ 13; ECF No. 83, ¶ 13). The discharge summary noted that Mr. Bishop

4

should follow-up with Dr. Brian Ng, a gastroenterologist, within one month, and with Dr. Maxa within one week. (ECF No. 76, ¶ 14; ECF No. 83, ¶ 14).

Upon returning to SCI Albion, Mr. Bishop was housed in the infirmary from August 31, 2014 until October 28, 2014. (ECF No. 76, ¶ 16; ECF No. 83, ¶ 16). On September 24, 2014, Mr. Bishop was sent to Hamot for a peripherally inserted central catheter (PICC) line placement and dehydration, after Dr. Maxa noted that intravenous (IV) access was attempted multiple times in lab draw without success. Dr. Maxa noted that IV access was needed for IV fluid and labs. (ECF No. 76, ¶ 22; ECF No. 83, ¶ 22).

On October 2, 2014, Dr. Maxa referred Mr. Bishop to a urologist, Dr. Lori Dulabon, at Hamot, for possible stent removal following Mr. Bishop's August 2014 stent placement and cystoscopy. Dr. Dulabon noted that the stents were out, there was no family history of prostate cancer, and that Mr. Bishop had a negative kidney CT on August 27, 2014, which revealed normal kidneys. Based upon Mr. Bishop's complaints of recurrent urinary tract infections and some episodes of gross hematuria, Dr. Dulabon sent Mr. Bishop's urine for repeat urine culture and cytologies. (ECF No. 76, ¶¶ 23-26; ECF No. 83, ¶¶ 23-26).

Mr. Bishop's October 2, 2014 urine culture results were "suspicious for malignant cells," (ECF No. 76, ¶ 27; ECF No. 83, ¶ 27), which prompted Dr. Maxa that same day to order another consultation with oncologist, Dr. Narinder Malhotra. (ECF No. 76, ¶ 28; ECF No. 83, ¶ 28). On October 21, 2014, Mr. Bishop was seen by Dr. Malhotra via telemed. At that time, Dr. Malhotra had discussed the case with Jennifer Naber, MD, a pathologist at Hamot. Dr. Naber advised that she could not make a definite diagnosis of Castleman's disease and it was decided to send the specimen obtained on August 6, 2014 to a lymphoma specialist at UPMC for a second opinion. At the time of the consult, the results were still pending. (ECF No. 76, ¶ 29; ECF No. 83, ¶ 29).

5

For Mr. Bishop's anemia, Dr. Malhotra recommended various blood tests and ferrous sulfate, an iron supplement. Dr. Malhotra also wanted a complete blood count to be completed every two weeks and a comprehensive metabolic panel and CT scan of the abdomen and pelvis done prior to Mr. Bishop's next visit. He was instructed to follow-up in two (2) months. (ECF No. 76, ¶ 30; ECF No. 83, ¶ 30). That same day, prison medical personnel placed orders for the bloodwork and CT scans, as ordered by Dr. Malhotra. (ECF No. 76, ¶ 31; ECF No. 83, ¶ 31).

On October 28, 2014, Mr. Bishop was sent to the emergency room at Hamot after advising Dr. Maxa that he was passing blood clots in his urine. Mr. Bishop was admitted to Hamot on October 28, and a CT scan of Mr. Bishop's abdomen and pelvis was performed that same day. (ECF No. 76, ¶¶ 34-35; ECF No. 83, ¶¶ 34-35). The CT showed that the right pelvic mass had not significantly changed since the previous study in August 2014. (ECF No. 76, ¶ 36; ECF No. 83, ¶ 36).

On October 31, 2014, while at Hamot, Mr. Bishop underwent a cystoscopy, performed by Dr. Dulabon, and the large bladder mass was biopsied. Pathology from the bladder mass revealed a well-differentiated adenocarcinoma. (ECF No. 76, ¶¶ 37-38; ECF No. 83, ¶¶ 37-38). Oncology was consulted and it was decided that Mr. Bishop would start palliative care, including radiation therapy to begin immediately. (ECF No. 76, ¶ 39; ECF No. 83, ¶ 39). While at Hamot, Mr. Bishop was also treated for a urinary tract infection, bacteremia, and sepsis, and he finished a course of antibiotics before being discharged. (ECF No. 76, ¶ 40; ECF No. 83, ¶ 40). Upon discharge, Mr. Bishop was to follow-up in one week with The Regional Cancer Center, among other providers. (ECF No. 76, ¶¶ 41-42; ECF No. 83, ¶¶ 41-42).

Mr. Bishop was discharged from Hamot on November 6, 2014 and was seen by Dr. Andrew Figura at The Regional Cancer Center that same day. The recommendation was to

6

proceed with a course of palliative radiation therapy to the pelvic mass to optimize potential for local control, since Mr. Bishop had no surgical options. (ECF No. 76, ¶ 43; ECF No. 83, ¶ 43). Mr. Bishop was returned to SCI-Albion on November 6, 2014 and was housed in the infirmary of SCI Albion from that date through January 3, 2015. (ECF No. 76, ¶ 44; ECF No. 83, ¶ 44). He began a course of palliative radiation to the bladder and pelvic mass on November 19, 2014. (ECF No. 76, ¶ 50; ECF No. 83, ¶ 50).

On December 3, 2014, Mr. Bishop was seen by Dr. Philip Symes at The Regional Cancer Center, and it was determined that "the best option [was] to complete the radiation and then reevaluate, restage with a CT scan." (ECF No. 76, ¶ 53; ECF No. 83, ¶ 53). On December 17, 2014, Mr. Bishop completed the course of palliative radiation to the bladder and pelvic mass. (ECF No. 76, ¶ 56; ECF No. 83, ¶ 56).

On January 3, 2015, Mr. Bishop was seen and evaluated by Dr. Hakala in the prison infirmary. Mr. Bishop was unresponsive and tachycardic, prompting Dr. Hakala to send Mr. Bishop to Hamot where he was admitted that same day. (ECF No. 76, ¶¶ 57-58; ECF No. 83, ¶¶ 57-58). On January 3 and 4, Mr. Bishop underwent chest x-rays, a retroperitoneum ultrasound, an EKG, and a CT scan of his abdomen and pelvis. (ECF No. 76, ¶ 59; ECF No. 83, ¶ 59). Mr. Bishop was discharged from UPMC-Hamot and returned to the infirmary at SCI-Albion on January 7, 2015, with orders to follow-up with Dr. Maxa in one week. (ECF No. 76, ¶¶ 60-61; ECF No. 83, ¶¶ 60-61).

Over the next four months, Mr. Bishop received therapies and other forms of care for his cancer and related symptoms. Mr. Bishop died at SCI-Albion on May 8, 2015. (ECF No. 76, ¶ 104; ECF No. 83, ¶ 104).

III.  Dr. Gelmann's Report

The substance of Dr. Gelmann's report is comprised of three paragraphs, two stating his clinical summary of the case, and one articulating his professional opinion. (ECF No. 101). The report notes that, prior to his hospitalization at Hamot, Mr. Bishop "had persistent complaints of abdominal pain for several months and a substantial weight loss that was recorded in one note as totaling 70 pounds." (*Id.*). The remainder of the report's "case summary" stated as follows:

> A CT of the abdomen and pelvis done August 5, 2014, showed a 10 x 6.3 cm cecal mass and evidence of small bowel obstruction. The patient was taken to surgery where a diverting ileostomy was performed to relieve the bowel obstruction. He also had a cystoscopy and ureteral stent placed. Biopsy of an enlarged lymph node showed Castleman's disease.
>
> Subsequent to the surgery the patient was readmitted at the end of August for dehydration and acute renal failure. By the beginning of November, the cecal mass had eroded through the bladder wall and caused hematuria. Cystoscopic biopsy of the eroding mass showed adenocarcinoma. Immunohistochemical staining of the mass was consistent with a colonic primary. The patient was treated with radiation to the pelvic mass. Over the next few months, liver metastases developed and were shown by biopsy to be metastatic adenocarcinoma. The records provided to me did not contain information about further treatment of the cancer after the radiation.

(*Id.*)

Dr. Gelmann's "Opinion" is stated in a single paragraph as follows:

> Mr. Bishop had a T4NxM0 colon cancer originating in his cecum and seen first on the CT done in August 2014. This cancer had caused his pain, bowel obstruction, and profound weight loss prior to August 2014. Biopsy of the lymph node at the time of the diverting colostomy was appropriate. The finding of Castleman's disease was unexpected. However, the pathologic findings of the

8

> lymph node did not explain the large cecal mass, which
> was more likely than not a colon cancer. The diagnosis of
> colon cancer was not pursued further at that time. The
> delay from the time of the Castleman's disease diagnosis to
> the diagnosis of adenocarcinoma more likely than not
> increased the risk of bladder invasion by the cancer. Had
> the colon cancer been diagnosed in August 2014 treatment
> would have been initiated with chemotherapy and radiation
> therapy. This treatment would have alleviated the
> symptoms and more likely than not prevented the bladder
> erosion by the colon cancer. Thus Mr. Bishop had
> additional complications, pain, and suffering due to the
> delay in diagnosis and initiation of appropriate treatment.

(*Id.*)

IV. Essential Elements of a Medical Malpractice Claim Requiring Expert Opinion

    A. Standard of Care and Deviation Therefrom

To support a prima facie case of medical malpractice under Pennsylvania law, "the plaintiff must establish (1) a duty owed by the physician to the patient, (2) a breach of duty from the physician to the patient, (3) that the breach of duty was the proximate cause of, or a substantial factor in, bringing about the harm suffered by the patient, and (4) damages suffered by the patient that were a direct result of that harm." *Mitzelfelt v. Kamrin*, 526 Pa. 54, 62, 584 A.2d 888, 891 (1990) (citing *Morena v. South Hills Health System*, 501 Pa. 634, 462 A.2d 680 (1983); Prosser, Law of Torts, Section 30 at 143 (4th ed. 1971)). To support the first and second of these elements, the plaintiff must establish by expert testimony "the recognized standard of care and that the care or treatment rendered fell below such standard." *Titchnell v. United States*, 681 F.2d 165, 169 (3d Cir. 1982); *Maresca v. Mancall*, 135 F. Appx 529, 531 (3d Cir. 2005); *Welsh v. Bulger*, 698 A.2d 581, 585 (Pa. 1997) ("[A] plaintiff must present expert testimony to establish to a reasonable degree of medical certainty that the defendant's acts deviated from an accepted medical standard, and that such deviation was the proximate cause of the harm

9

suffered."). Where the plaintiff's medical expert fails to "articulate an opinion to any degree of medical certainty that [the defendant] breached any requisite standard of care," the defendant is entitled to judgment as a matter of law. *Maresca*, 135 F. Appx at 531; *Hakeem v. Salaam*, 260 F. Appx 432, 435 (3d Cir. 2008) ("Absent expert opinion that the [defendant's] treatment deviated from acceptable medical standards, a reasonable fact-finder could not conclude that the [defendant] acted negligently")(applying Pennsylvania law in a Federal Tort Claims Act case); *Corrado v. Thomas Jefferson Univ. Hosp.*, 790 A.2d 1022, 1031 (Pa. Super. Ct. 2001) (holding that even where the expert identifies a defendant's deviation from the standard of care, the expert's opinion is insufficient unless rendered to a reasonable degree of medical certainty).

The requirements relating to expert testimony in this context, while fundamental, are not unduly rigid or formalistic. Experts are not required to use "magic words" when testifying as to the applicable standard of care. *Maurer v. Trs. of the Univ. of Pa.*, 614 A.2d 754, 762 (Pa. Super. Ct. 1992) (*en banc*), *app. granted*, 626 A.2d 1158 (Pa. 1993) (citing *Mitzelfelt*, 584 A.2d at 894). Pennsylvania courts have consistently explained that "the standard of care in medical malpractice actions is first and foremost what is reasonable under the circumstances." *Joyce v. Boulevard Physical Therapy & Rehab. Ctr., P.C.*, 694 A.2d 648, 656 (Pa. Super.Ct. 1997) (citing *Collins v. Hand*, 246 A.2d 398 (1968)). But Pennsylvania law is clear that an expert's complete failure to address the standard of care constitutes a failure of proof on this element of a medical malpractice claim. *Maurer*, 614 A.2d at 762 (expert's omission was not a lack of "magic words," but "rather the absence of any statement by the plaintiffs' sole expert to the effect that [physician's] failure ... was a deviation from the standard of care or from acceptable medical practices") .

10

### B. Proximate Causation

A plaintiff in a medical malpractice action is also required to present an expert witness who will testify, to a reasonable degree of medical certainty, that the defendant's deviation from good and acceptable medical standards "was the proximate cause of the harm suffered."[4] *Mitzelfelt*, 584 A.2d at 892 (citing *Brannan v. Lakenau Hospital*, 417 A.2d 196 (Pa. 1980); *Wooding v. United States of America*, 2007 WL 951494, at *5 (W.D. Pa. 2007) ("Not only does the plaintiff have the burden of proving that the defendant did not possess and employ the required skill and knowledge, or did not exercise the care and judgment of a reasonable professional, he or she must also provide that the injury was caused by the failure to employ that requisite skill and knowledge. We have previously concluded that this must be accomplished with expert medical testimony presented at trial by doctors testifying as expert witnesses."). *See also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 750 (3d Cir. 1994) ("Pennsylvania requires experts to testify that defendant's actions caused plaintiff's illness with a reasonable degree of medical certainty"). However, "[t]he expert need not express his opinion in precisely the same language we use to enunciate the legal standard." *Cohen v. Albert Einstein Medical Ctr.*, 592 A.2d 720, 724 (Pa. Super. Ct. 1991), *appeal denied*, 602 A.2d 855 (1992) (quoting *Kravinsky v. Glover*, 396 A.2d 1349 (Pa. Super. Ct. 1979) (citation within *Kravinsky* omitted)).

---

[4] A "very narrow exception" to the expert testimony requirement applies, however, when "the matter is so simple or the lack of skill or care so obvious as to be within the range of experience and comprehension of even nonprofessional persons." *Toogood v. Rogal*, 824 A.2d 1140, 1145 (Pa. 2003) (quoting *Hightower–Warren v. Silk*, 698 A.2d 52, 54 n.1 (1997)). This exception has been "carefully limited" because "to say whether a particular error on the part of a physician reflects negligence demands a complete understanding of the procedure the doctor is performing and the responsibilities upon him at the moment of injury." *Id.* at 1149. In other words, it is not enough to establish that a medical provider made a mistake because "making a mistake is not negligence as a matter of law." *Id.* at 1150. Thus, to hold a medical provider liable, "the burden is upon the plaintiff to show that the [provider] failed to employ the requisite degree of care and skill." *Id.* "A plaintiff can do that without expert testimony only when the physician's failure is clear even to a non-professional." *Brown v. Hahnemann Univ. Hosp.*, 20 F. Supp. 3d 538, 543 (E.D. Pa. 2014). Where "both the standard of care and causation are at issue, the defendant's lack of skill or care and the causal relationship must be obvious." *Id.* (citing *Grossman v. Barke*, 868 A.2d 561, 567 (Pa. Super. Ct.2005)).

11

The foregoing principles are a bit more nuanced in a delayed diagnosis of disease case. Requiring expert testimony espousing a strict "but for" causation opinion to satisfy the causation requirement would frequently present a nearly impossible burden for plaintiffs in cases alleging a delayed diagnosis of diseases such as cancer. *Mitzelfelt*, 584 A.2d at 892. "Although timely detection of ... cancer may well reduce the likelihood that the patient will have a terminal result, even with timely detection and optimal treatment, a certain percentage of patients unfortunately will succumb to the disease." *Id.* Recognizing the inequity that would arise if plaintiffs were required to produce expert testimony that "but for" the defendant's negligence the subject of that negligence would not have experienced his or her ultimate harm, the Pennsylvania Supreme Court adopted an "increased risk" of harm standard of causation. Under this standard, once the plaintiff introduces expert testimony to show that the medical defendant negligently failed to detect the cancer in a timely fashion and that this failure increased the risk that the plaintiff or plaintiff's decedent would have either a shortened life expectancy or suffered other harm, then it is a question for the jury to determine whether the acts or omissions of the defendant were a substantial factor in bringing about the harm. As the Pennsylvania Supreme Court explained in *Hamil v. Bashline*, "[o]nce a plaintiff has introduced evidence that a defendant's negligent act or omission increased the risk of harm to a person in the plaintiff's position, and that the harm was in fact sustained, it becomes a question for the jury as to whether or not that increased risk was a substantial factor in producing the harm." 392 A.2d 1280, 1286 (Pa. 1978). Even under this relaxed standard, however, the expert's opinion must be expressed to a reasonable degree of medical certainty or equivalent terms. *Corrado*, 790 A.2d at 1031 (holding that in delayed diagnosis of cancer case, expert testimony that earlier diagnosis "probably" or "more likely than not" would have led to a better outcome is insufficient).

12

V.  Expert Report Requirements Under Rule 26(a)(2)(B)(i) and their Application on Motions Pursuant to Rule 56

The parameters of Dr. Gelman's opinions are defined by the expert report produced pursuant to Rule 26(a) of the Federal Rules of Civil Procedure. Among other requirements, Rule 26(a) dictates that the report of an expert witness contain "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). To ensure compliance with this rule and avoid unfair surprise, an expert witness's trial testimony is generally limited to opinions within the scope of the expert's report. *Baird v. Goldstein*, 1998 WL 221030, at *3 (E.D. Pa. May 1, 1998) (*aff'd*, 178 F.3d 1278 (3d Cir. 1999)). Although Rule 26 will not require "verbatim consistency" between the report and the expert's trial testimony, the expert's testimony must represent "a reasonable synthesis and/or elaboration of the opinions contained in the expert's report." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 585 F. Supp. 2d 568, 581 (D. Del. 2008) (citing *Boehringer Ingelheim Intern. GMBH v. Barr Laboratories, Inc.*, 2008 WL 2756127, *3 (D. Del. July 15, 2008); *Forest Labs., Inc. v. Ivax Pharms., Inc.*, 237 F.R.D. 106, 113 (D. Del.2006)).

The foregoing principles are relevant not only to defining the scope of an expert's testimony at trial but also in determining whether an expert's report concerning an essential element of the plaintiff's case, such as defining the standard of care in a medical malpractice action, is sufficient to raise a genuine issue of material fact on a motion for summary judgment. *See, e.g., Bonesmo v. Nemours Found.*, 253 F. Supp. 2d 801, 811 (D. Del. 2003). In *Bonesmo*, the court explained, "[a]lthough an expert is not expected to articulate the standard of care with legal precision, Rules 26(a)(2)(B) and 56 require the designation of specific facts showing a genuine issue, through a detailed statement of the expert's opinions and the bases and reasons for the opinions." *Id.* The court further noted that "the opposing party is not required to depose the

13

expert to develop what his opinion is or the reasons for it." *Id.* Rather, the report must disclose the expert's opinions with enough clarity to allow the opposing party and the court to understand what opinion testimony the expert will offer at trial without having to speculate or guess at what the expert's opinions may be. "A subliminal 'signal' that the expert holds some secret opinion is not enough to satisfy Rule 26; instead, an explicit statement of the content of the opinion is required...." *Harrison Bros. Dry Dock & Repair Yard v. Pan Agri Int'l, Inc.*, 2009 WL 3273926, at *3 (S.D. Ala. Oct. 9, 2009).

In the context of this case, the applicable standard of review imposed upon Hamot, as the party moving for summary judgment, the initial burden of identifying evidence, or the lack thereof, which demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986); *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007); *UPMC Health System v. Metropolitan Live Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004). Having identified essential elements of Ms. Bishop's claim for which required evidentiary support is absent, the burden then shifted to Ms. Bishop to come forward with specific facts showing a genuine issue for trial. Fed.R.Civ.P. 56(e); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460–61 (3d Cir. 1989) (the non-movant must present affirmative evidence—more than a scintilla but less than a preponderance—which supports each element of his claim to defeat a properly presented motion for summary judgment). As the non-moving party, Ms. Bishop was required go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents to meet her burden of proving elements essential to her claim. *Celotex*, 477 U.S. at 322. *See also Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001).

14

VI. Analysis: Dr. Gelmann's report fails to offer an expert opinion regarding the applicable standard of care, whether Hamot deviated from the standard care, and whether any such deviation increased the risk of harm to Mr. Bishop.

In the present case, Dr. Gelmann's report does not discuss or opine regarding the standard of care or whether Hamot's conduct deviated from the standard of care. Dr. Gelmann's report notes that Hamot personnel first observed the presence of the cecal mass by means of a CT scan in August of 2014. After acknowledging that the lymph node biopsy performed at Hamot was appropriate, Dr. Gelman goes on to note that "the pathologic findings of the lymph node did not explain the large cecal mass, which was more likely than not a colon cancer." Dr. Gelmann then states that the "diagnosis of colon cancer was not pursued further at that time" and that the "delay from the time of the Castleman's disease diagnosis to the diagnosis of adenocarcinoma more likely than not increased the risk of bladder invasion by the cancer." Dr. Gelmann does not opine, however, that the delay in diagnosing Mr. Bishop's cancer involved or was the result of any deviation from the standard of care by Hamot or any other medical provider. Indeed, the "Opinion" section of Dr. Gelmann's report does not even mention Hamot. The use of the passive voice throughout the report complicates the Court's review of its sufficiency to support a claim against Hamot. (e.g., "The diagnosis of colon cancer was not pursued further at that time." "Had the colon cancer been diagnosed in August 2014 treatment would have been initiated with chemotherapy and radiation therapy.")

Even if the Court were to assume that the report implicitly attributes the delay in diagnosing Mr. Bishop's cancer to Hamot, rather than to one of the other medical providers who provided care to him after August 5, 2014, Dr. Gelmann's report would still be insufficient to support essential elements of the claim because a delay in diagnosing a condition is actionable

15

only if it resulted from a deviation from the applicable standard of care.[5] *See Maresca v. Mancall*, 135 F. Appx 529, 531 (3d Cir. 2005) (entry of judgment as a matter of law appropriate where plaintiff's expert in support of delayed diagnosis claim "did not articulate an opinion to any degree of medical certainty that either Dr. Mancall or the Hospital breached any requisite standard of care..."); *Neidig v. United States*, 2010 WL 1023937, at *5 (W.D. Pa. Mar. 17, 2010) (holding that in a delayed diagnosis case, medical report that did "not opine as to the specific legal issues of breach of the standard of care or proximate cause (the causal connection between the breach of duty and the resulting injury)" was legally insufficient to support a medical malpractice claim); *Laskowski v. U.S. Dep't of Veterans Affairs*, 918 F. Supp. 2d 301, 314 (M.D. Pa. 2013) (expert's failure to identify any act or omission by the medical defendant as deviating from the standard of care is a fundamental defect in malpractice claim).

Dr. Gelmann offered only one opinion directly commenting on whether Hamot's services complied with the applicable standard of care: "Biopsy of the lymph node at the time of the diverting colostomy was appropriate." While he noted that the pathological results "did not explain the large cecal mass" and that the mass "was more likely than not colon cancer," he did not opine that any medical provider's failure to diagnose the mass as such at the time fell below the applicable standard of care; nor did he identify any unperformed diagnostic testing or other actions that accepted medical standards warranted be performed by Hamot or any other medical provider. He specifically does not criticize or question the decision not to attempt to resect or

---

[5] The medical records produced as part of the summary judgment record document that Mr. Bishop was under the care of multiple medical providers following his admission to Hamot on August 5, 2014. These providers included The Regional Cancer Center, Philip H Symes, MD, an oncologist at The Regional Cancer Center, Dr. Narinder K Malhotra MD, an oncologist from Titusville, Pennsylvania, and the medical department at SCI-Albion. *See* ECF No. 71& accompanying exhibits; ECF No. 80. Dr. Gelmann's report similarly does not opine regarding the care provided by any of these providers, and, in any case, nothing in the record supports a finding that a relationship existed between any of them and Hamot upon which a finding of vicarious liability could be sustained. Plaintiff did not depose any of the medical providers in this case.

biopsy the cecal mass during the procedures on August 6, 2015, based upon concern that doing so could damage Mr. Bishop's colon. In summary, Dr. Gelmann's report does not support a finding that any delay in diagnosing Mr. Bishop's cancer was due to or involved any deviation from the standard of care.

Relying exclusively on Dr. Gelmann's report, Ms. Bishop also cannot satisfy the "increased risk" standard necessary to sustain the causation element of her claim. First, it necessarily follows that because the report does not support a deviation from the standard of care, it likewise cannot support that such a deviation caused harm or increased the risk of harm to Mr. Bishop. Dr. Gelmann does opine that the delayed diagnosis of cancer may have decreased the efficacy of therapeutic and palliative treatments. While this observation applies to most occurrences of cancer—the earlier its detection and diagnosis, the more likely treatments will be effective—it does not speak to the essential causation element of Ms. Bishop's claim, specifically: whether the *defendant's "breach of duty* was the proximate cause of, or a substantial factor in, bringing about the harm suffered by the patient." *Mitzelfelt*, 584 A.2d at 891 (emphasis supplied); *Ellison v. United States*, 753 F. Supp. 2d 468, 477 (E.D. Pa. 2010) (holding that expert medical testimony is required to establish that *defendant's breach* proximately caused plaintiff's injury). Second, Dr. Gelmann's opinion that the "delay from the time of the Castleman's disease diagnosis to the diagnosis of adenocarcinoma *more likely than not increased the risk* of bladder invasion by the cancer" is not stated to the requisite certainty required under Pennsylvania law. In medical malpractice cases involving delayed diagnosis of diseases such as cancer, the causation element of the prima facie case is relaxed by allowing the plaintiff to satisfy this element by showing an "increased risk" of harm, rather than requiring "but for" causation. *Mitzelfelt*, 584 A.2d at 892. The expert's opinion concerning this increased

risk, however, must still be expressed to a reasonable degree of medical certainty. *Corrado*, 790 A.2d at 1031. Here, Dr. Gelmann's report does not opine with sufficient medical certainty that the delay in diagnosis increased the risk of the cancer spreading to Mr. Bishop's bladder.

VII.    Conclusion

Although Dr. Gelmann's report begins by stating that he "will provide [his] opinion that is rendered to a reasonable degree of medical certainty about the medical practice issues in the case," the substance of the report does not address or offer any opinions regarding the standard of medical care applicable to Hamot's care of Mr. Bishop, any deviation from that standard, or any causal relationship between any deviation from the standard of care and an increased risk of harm to Mr. Bishop. Given Plaintiff's exclusive reliance on Dr. Gelmann's report to support these essential elements of his medical malpractice claim, the absence of opinions addressing these elements compels the Court to grant Hamot's motion for summary judgment.[6] *See Celotex Corp.*, 477 U.S. at 322 (summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

---

[6] The Court notes that Ms. Bishop has not asserted an institutional negligence claim against Hamot. A hospital may be held directly liable for its own "institutional" negligence if it fails in its nondelegable duty to uphold the proper standard of care it owes to a patient. *Thompson v. Nason Hosp.*, 339, 591 A.2d 703, 707 (Pa. 1991). In contrast to a hospital's potential vicarious liability for its employees' actions, a cause of action for corporate liability "is independent of the negligence of the hospital's employees or ostensible agents" and "arises from the policies, actions or inaction of the institution itself...." *Moser v. Heistand*, 681 A.2d 1322, 1326 (Pa. 1996). Even if such a claim had been presented, summary judgment for Hamot would still be required. To establish a breach of institutional duty, a plaintiff must prove that the hospital had actual or constructive knowledge of the defect or procedures which created the harm and that the hospital's negligence was a substantial factor in bringing about the harm. *Id.* at 708. Unless a hospital's negligence is "obvious," a plaintiff must produce expert testimony to establish the breach of duty and "substantial factor" components of such a claim. *Welsh v. Bulger*, 698 A.2d 581, 585 (Pa. 1997). No record evidence has been presented to support either of the foregoing elements.

Judgment in favor of Hamot will be entered by separate order in accordance with Fed. R. Civ. P. 58.[7]

Dated this 25th day of November, 2019.

/s/ Richard A. Lanzillo
RICHARD A. LANZILLO
UNITED STATES MAGISTRATE JUDGE

---

[7] All parties have consented to the jurisdiction of a United States Magistrate Judge to hear this action and enter final judgment.